BESSEMER TRUST COMPANY,
N.A., Plaintiff,

v.

Francis S. BRANIN, Jr., Defendant.

No. 02 Civ. 10276(JES).

United States District Court,
S.D. New York.

April 10, 2006.

Chadbourne & Parke LLP, New York, NY (Donald I. Strauber, C. Ian Anderson, Melissa J. LaRocca), for Plaintiff Bessemer Trust Company, N.A., of counsel.

Bond, Schoeneck & King, PLLC, New York, NY (Louis P. DiLorenzo, Michael I. Bernstein, Michael P. Collins, Paul Limmiatis), for Defendant Francis S. Branin, Jr., of counsel.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff, Bessemer Trust Company, N.A. ("Bessemer" or "plaintiff"), brings this action against defendant, Francis S. Branin, Jr. ("Branin" or "defendant"), alleging a violation of the rule of law set forth in *Von Bremen v. MacMonnies*, 200 N.Y. 41, 93 N.E. 186 (1910) and *Mohawk Maintenance Co. v. Kessler*, 52 N.Y.2d 276, 419 N.E.2d 324, 437 N.Y.S.2d 646 (1981), which prohibits the impairment of good will which was transferred to a purchaser in connection with the sale of a business. The Court conducted a bench trial on liability from September 20 to September 27, 2004, and heard Summations and Oral Argument on December 17, 2004 and March 14, 2005, respectively. Having heard and observed all witnesses, considered all the evidence presented, as well as the arguments made by the parties' counsel, the Court, for the reasons set forth below, finds in favor of plaintiff in part and in favor of defendant in part. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## BACKGROUND

In 1977 defendant joined the investment management firm of Brundage, Story and Rose, LLC ("Brundage"), Trial Tr. at 253; Pl.'s Trial Ex. 43, and became one of several principals/owners of the firm in 1982, Joint Pre-Trial Order, dated Aug. 9, 2004, Ex. A, Joint Statement of Undisputed Facts ("Facts") ¶ 3; Trial Tr. at 242. Until October 2000, defendant served as a portfolio manager at Brundage, a position which entailed working directly with clients and making investment decisions for each individual account handled. *See* Facts ¶ 3; Trial Tr. at 286.

In August 1999 Brundage began discussions with Oppedisano & Company, Inc. ("Oppedisano & Co."), a firm specializing in consulting investment management firms regarding mergers and acquisitions, about a possible acquisition by Bessemer, Facts ¶¶ 4–5, a federally chartered banking institution that provides investment advisory services to clients, *id.* ¶ 1. Unlike Brundage, however, plaintiff's investment management business was structured in a more centralized fashion, such that those in defendant's position functioned as "client account managers" and did not make investment decisions for the portfolios of their clients. *See* Trial Tr. at 103–04, 227, 285–87, 361. That Bessemer operated in this fashion was well known to the investment management industry, *id.* at

229, and to defendant as well, *id.* at 363, 428, 545–46. Despite this and a series of other differences between Brundage and Bessemer, *see id.* at 428–33, 543–47, the two firms entered into a Purchase Agreement dated August 18, 2000, Facts ¶ 12; Pl.'s Trial Ex. 24 ("Purchase Agreement"). Defendant supported, and worked towards the consummation of, the transaction. Trial Tr. at 427–29, 544.

Pursuant to the Purchase Agreement, Bessemer purchased the assets of Brundage, including Brundage's client accounts and related good will. Facts ¶ 13. Under the Agreement, Bessemer made an initial payment of $50 million, *id.* ¶ 17, which was divided amongst the eight owners of Brundage based on a variety of factors, *id.* ¶ 18; Purchase Agreement at Annex I; Trial Tr. at 547–48. Defendant received over $9.1 million of this initial payment. Facts ¶ 19. In addition to the initial payment, the Purchase Agreement contained a number of contingent payments that could be earned by the now-former owners of Brundage ("Brundage partners") based upon their collective ability to successfully transfer accounts to Bessemer, to enhance the revenues of the transferred accounts, to retain the accounts at Bessemer, and to reduce expenses. *Id.* ¶¶ 20–21; Trial Tr. at 553–60; Pl.'s Trial Ex. 14.

The Brundage partners received their first contingent payment, in the amount of $10 million, in September 2001, after they successfully transferred a requisite percentage of accounts from Brundage to Bessemer. Facts ¶¶ 23–24; Trial Tr. at 554; Pl.'s Trial Ex. 41. Defendant received over $2.25 million of this payment. Facts ¶ 25. The Brundage partners also earned a contingent payment for reducing expenses—a payment which pursuant to the Purchase Agreement would be paid eighteen months after the close of the acquisition, and, given that it was calculated as two times any costs successfully reduced, was all but guaranteed to be paid in some amount. *See* Facts ¶ 26; Trial Tr. at 554–57. On account of this contingent payment, in April 2002 the Brundage partners received approximately $15 million, *see* Facts ¶ 27, of which defendant received over $3.7 million, *id.* ¶ 28.

Although the Brundage partners successfully earned two of the available contingent payments, they could not meet the requirements for the remaining two payments—an outcome that was all but assured shortly after the acquisition. *See id.* ¶ 29. In January 2001, Cheryl Grandfield, one of the Brundage partners, left Bessemer to form her own investment management firm. Trial Tr. at 333–36, 560–64. After actively soliciting her clients to follow her, Grandfield was sued by Bessemer. *Id.* The case was settled in April 2001 with Grandfield returning the $5 million she received pursuant to the Purchase Agreement in exchange for permission to solicit her clients. *Id.* As a result of Grandfield's departure, and the departure of many of her clients, the Brundage partners were unable to meet the requirements for the remaining contingent payments. *Id.* at 560–64.

Branin considered his experience at Bessemer to be unpleasant, *see id.* at 246–53, 262, 493–502, and by September 2001 he contacted Oppedisano & Co. about exploring different employment opportunities to begin sometime in the second quarter of 2002, *see id.* at 72–73, 253–59; Facts ¶ 39. On November 7, 2001 Branin met with William Rankin, President and Chief Executive Officer of Stein Roe Investment Counsel LLC ("Stein Roe"), a wealth management firm that was interested in "lifting out" Branin and his business from Bessemer. Facts ¶¶ 33, 36–38, 40–43, 45; Trial Tr. at 73–81; Pl.'s Trial Ex. 45. At a December 21, 2001 lunch with fellow

Brundage partner Paul Barkus, Branin discussed the possibility of joining Stein Roe, Trial Tr. at 596–97, indicated that he understood that the owners of Stein Roe were considering the sale of their business in the near future, *id.* at 596–97, 600–01, explained that he thought that he "had learned from [Grandfield] the right way to transition clients from Bessemer to another firm," *id.* at 597, 599–600; *see id.* at 193, 339–40, and expressed the hope that this situation would give him the opportunity to "sell my clients again," *id.* at 600–01.

Over the ensuing months defendant kept in periodic contact with Rankin, *see id.* at 93, and the two discussed Branin's current client base, his ability to, and expectations regarding, the transfer of clients from Bessemer to Stein Roe, and his desired compensation, *id.* at 94–104, 132, 141, 264–72; Pl.'s Trial Ex. 60. Defendant expressed his hope that within twelve months of joining Stein Roe he would be able to transfer $1.5 to $1.8 million of the approximately $2.3 million in revenues that he generated at Bessemer. Pl.'s Trial Exs. 55, 60; Trial Tr. at 141, 265–72. Rankin was less sanguine, *see* Trial Tr. at 141; Pl.'s Trial Ex. 60, but was nonetheless cognizant that Branin needed to transfer a significant amount of business from Bessemer in order for the relationship to be successful, *see* Trial Tr. at 81, 132, 195–99.

By late May or early June 2002 Branin had informed Rankin that he planned to join Stein Roe, Facts ¶ 51; Trial Tr. at 264, and that he wished for his principal assistant, Alexandra Fuhrmann, to join him, *see* Facts ¶ 64; Trial Tr. at 290–96. Fuhrmann, who had worked for Branin and Barkus at Brundage, Facts ¶ 63,

worked exclusively for Branin at Bessemer where she carried out various tasks regarding his accounts—tasks which resulted in her having spoken to approximately 70% of his clients, *see id.* ¶ 64; Trial Tr. at 840–41, 898.[1]

On July 12, 2002, Branin tendered his resignation to Bessemer. Facts ¶ 56; Pl.'s Trial Ex. 62. He informed his staff, including Fuhrmann, of his decision to leave Bessemer and join Stein Roe. Trial Tr. at 290, 296–97, 854–55. Fuhrmann immediately contacted Stein Roe, informed them that she worked for Branin, and asked if they had a position available for her. *Id.* at 861–63; Facts ¶ 65. Within hours Fuhrmann was interviewing with Eric Propper, the head of Stein Roe's New York office. Facts ¶ 66; Trial Tr. at 108, 863. Fuhrmann was told that there were no positions available. Facts ¶ 67; Trial Tr. at 864, 942–47.

Despite this inauspicious start, on July 15, 2002, Fuhrmann, who was never asked to provide references or recommendations of any kind, *see* Trial Tr. at 937–42, interviewed with Rankin, *id.* at 108–09, and the following day she interviewed with a group of Stein Roe employees, *id.* at 875–76; Pl.'s Trial Ex. 69. The latter meeting went poorly and the interviewers reported back to Rankin with "[r]esoundingly negative" feedback, stating that "[i]n a vacuum, would never hire her" because of her "unfortunate personality" and "overly aggressive" demeanor. Pl.'s Trial Exs. 68, 90; Trial Tr. at 112–14, 127–28, 194, 876–77, 944–51; Facts ¶¶ 79–81.

Meanwhile, Bessemer, which was not informed of Fuhrmann's attempts to join Stein Roe, *see* Facts ¶ 69, looked to Fuhrmann to fill the void left by Branin's

---

1. Branin's testimony that only 25–50% of his client base knew Fuhrmann, *see* Trial Tr. at 287, is simply incredible given that Fuhrmann placed the number at 70%, *see id.* at 898, and Barkus, who was familiar with Branin's clients from Brundage, *see id.* at 542, 592–94, 606, estimated that 75–80% of his clients knew her, *see id.* at 604.

departure, *see id.* ¶¶ 70–72. Bessemer asked Fuhrmann to call many of Branin's clients, named her senior client account manager on a number of his accounts, and informed numerous customers, in letters dated July 24, 2002, that she would be assuming the day-to-day responsibilities for their accounts. *See id.* ¶¶ 70–72, 75; Trial Tr. at 595–96, 607–09, 873–89, 963–66; Pl.'s Trial Exs. 59, 84.

By letter dated July 12, 2002, Stein Roe formalized its employment offer to defendant, Facts ¶ 57; Pl.'s Trial Ex. 75, and defendant began working at Stein Roe's New York office on July 29, 2002, Facts ¶ 62. Pursuant to the offer letter, in addition to a base salary of $250,000, benefits, and an option award of eight hundred shares in Stein Roe Investment Counsel Holdings LLC, Pl.'s Trial Ex. 75; Facts ¶¶ 58, 60, Branin was given the option of two different "Transition Incentive Arrangements"—payments that were designed to "shar[e][the] economic risk" while providing an incentive for the speedy transfer of accounts to Stein Roe, *see* Trial Tr. at 65–66, 82–89. Branin could choose to receive one payment equal to 60% "of the annual run rate of revenues managed" twelve months after joining the firm, or two payments equal to 40% of the annual run rate at his one and two year anniversaries with the firm. *See* Pl.'s Trial Ex. 75. Branin chose the former option. *See* Trial Tr. at 281; Facts ¶ 61.

On August 2, 2002, despite the dearth of an opening and the resoundingly negative feedback, Fuhrmann was offered a position as Vice President at Stein Roe—an offer which she immediately accepted, Facts ¶ 76; Trial Tr. at 889–90, 941–52; Pl.'s Trial Ex. 108, and which Rankin explained was a way to make Branin comfortable and to assist in the administrative work that needed to be done, *see* Trial Tr. at 109–125. According to Barkus, however, given

the responsibilities recently entrusted to Fuhrmann by Bessemer, the move made Bessemer "look[ ] kind of foolish to the clients," Trial Tr. at 609; *see also* Pl.'s Trial Ex. 111, and he informed her that he "thought the only reason that [Branin] and Stein Roe wanted her to go to Stein Roe was to help [Branin] transfer accounts from Bessemer to Stein Roe," Trial Tr. at 594. Fuhrmann's salary and bonus at Stein Roe were paid by Branin, with Stein Roe in effect splitting the cost of her base salary by increasing Branin's Transition Incentive Arrangement to 65% of the run rate of revenues managed. *See* Facts ¶¶ 86–87; Pl.'s Trial Ex. 102; Trial Tr. at 126–27, 310. Fuhrmann was not told of this arrangement until January 2003. *See* Trial Tr. at 905–08, 980.

Shortly after defendant's arrival, Stein Roe, acting upon a request of defendant, decided to "push along th[e] process" of Branin's "transferring [of] accounts from Bessemer to [Stein Roe]," *see* Facts ¶¶ 88–90; Pl.'s Trial Ex. 97, by approving a new schedule of fee rates to be charged to those clients who followed Branin from Bessemer. Facts ¶ 90; Trial Tr. at 68–71, 133–35, 341–44; Pl.'s Trial Ex. 97. Branin worked at "transitioning clients, carefully!," *see* Pl.'s Trial Ex. 147; Trial Tr. at 321–22, and after just over a month at Stein Roe approximately twenty-five client relationships were in the process of following him from Bessemer, *see* Facts ¶ 92.

Rankin and Stein Roe were aware that New York law placed restrictions on Branin's activities, *see* Trial Tr. at 185–93; Pl.'s Trial Ex. 89, but they understood that the "lift-out" would only be successful if they could "move clients from [Bessemer] to us!!!," *see* Pl.'s Trial Ex. 189; Trial Tr. at 185–94. As to how this would be accomplished, Rankin stayed mostly in the dark, *see* Trial Tr. at 190–91, 197–98, though he knew that it was a foreseeable possibility

that Branin would step over the line, *see id.* at 191–92.

By Summer 2003, Branin had successfully transitioned approximately thirty client relationships from Bessemer to Stein Roe, Facts ¶ 93, which accounted for $205 million of the $228 million in assets that he managed at Stein Roe, *id.* ¶¶ 94–95. These accounts included the Palmer account, which was over $117 million, and the Glen Raven, Inc. account, which amounted to over $16 million. *Id.* ¶¶ 97, 117.

In dealing with his clients, Branin came up with a standard response to the inquiry as to why he left Bessemer to join Stein Roe. When asked, he told them that "a firm like Stein Roe was far more appropriate for me, . . . that the method of dealing with clients, that the approach whereby portfolio managers managed the client portfolios and interacted directly with the clients was more . . . appropriate for my training and experience of 30 years in the business." *Id.* ¶ 103; Trial Tr. at 394–96, 536–37. Some clients requested information about the firm, and defendant obliged by sending the requested materials. *See* Trial Tr. at 527.

Other clients required more individualized attention. For example, Allen Gant, Jr., Chief Executive Officer of Glen Raven, Inc. ("Glen Raven") and uncle to defendant's wife, *id.* at 679–80, had discussions with defendant at Gant's house regarding his departure from Bessemer, *id.* at 697–709. Following due diligence review into Stein Roe by Glen Raven's adviser BT Alex Brown, Glen Raven decided to follow Branin, who served as director to that firm for twenty years, to Stein Roe. *See* Trial Tr. at 407, 711–13, 757–60.

Similarly, in Summer 2002, the Palmer family requested meetings with Bessemer and Stein Roe to discuss the future of their account. Trial Tr. at 771–73; Pl.'s Trial Ex. 98. The Palmer family had been longtime clients of Brundage, where Branin was first introduced to the account. *See* Trial Tr. at 761–63. At some point Branin became the lead portfolio manager on the Palmer account and Barkus took over as the "number two." *Id.* at 763–65. Carleton Palmer, III ("Palmer"), one of the decisionmakers within the Palmer family, *id.* at 384, considered Branin a close personal friend but "ha[d] no trouble separating business and friendship." *Id.* at 766.[2]

Following Palmer's request for a meeting, defendant worked to assemble a group of Stein Roe employees for what he described as a "dog and pony" for a "LARGE client relationship that I am hoping will join [Stein Roe]." Pl.'s Trial Ex. 103. The purpose of the "dog and pony" was to make a good impression on Palmer and to, in effect, sell Stein Roe to him. *See* Trial Tr. at 143–46, 377–79. As such, Branin organized a meeting with his colleagues, held on August 22, 2002, to strategize in advance of the meeting with Palmer. *Id.* at 148–49, 379–93; Facts ¶ 101. At the August 22 meeting Branin told his colleagues about Palmer, discussed the nature of his account, explained that Palmer invested one hundred percent in equities, and indicated that Palmer took a conservative approach to investing. *See* Trial Tr. at 146–49, 381–93. On August 29, 2002, Palmer arrived in New York for meetings with Stein Roe and Bessemer. Facts ¶¶ 104–05, 110. At the Stein Roe meeting, which included Branin, Rankin, and Propper, *id.* ¶ 114; Trial Tr. at 776, Palmer took charge and asked questions about the

---

**2.** For the sake of simplicity, the Court will hereinafter refer to the Palmers and their account as "Palmer" and "his account" or "the Palmer account," respectively. "Palmer" also refers to Carleton Palmer, III, who testified before the Court.

firm, *see* Trial Tr. at 152, 354, 401, 776; Facts ¶ 109. As for Branin, he introduced Palmer to his new firm, *see* Trial Tr. at 152, 225, 776, and he also "occasionally amplif[ied] a point if he knew it was something [Palmer] would be interested in from his relationship with [Palmer]," *id.* at 776. Palmer recalled no discussions about either fixed income or alternative investments. *Id.* at 813–14.

Following the Stein Roe meeting, Palmer went to a meeting with Bessemer. Facts ¶ 110. At Bessemer Palmer learned that Barkus would be the principal on his account, *see* Trial Tr. at 778, and he listened to presentations about alternative investments and a variety of services offered at Bessemer—two topics in which he had little interest, *see id.* at 778–79, 814–15. Palmer left the meeting underwhelmed. *Id.* at 825.

After the meetings Palmer was leaning towards following Branin to Stein Roe. *Id.* at 784–85. Before deciding, however, Palmer wanted to further "test" Branin, so he invited him to Ohio to make a specific proposal on behalf of Stein Roe—a meeting which took place on September 16, 2002. *Id.* at 786; Facts ¶ 112. At that meeting Branin informed Palmer that he would pay the same fees that he was paying at Bessemer, *see* Trial Tr. at 405–06, and that Rankin, with whom Palmer was "very impressed," *id.* at 782, 816, would serve as the "number two" on his account, *id.* at 787, 816. By letter dated September 17, 2002, Palmer moved his account to Stein Roe. *See* Def.'s Trial Ex. TTTT; Trial Tr. at 789; Facts ¶ 116.

In March 2004 Stein Roe was purchased by AMVESCAP. *See* Trial Tr. at 153. At that time, the stock options Branin received when he joined Stein Roe were accelerated, and as a result Branin received approximately $500,000 in the transaction. *Id.* at 182–83.

This action was brought by Complaint dated November 22, 2002. By Order dated April 2, 2004, this Court denied cross-motions for summary judgment and scheduled a bench trial on liability on plaintiff's claim. That trial commenced on September 20, 2004, and the Court heard testimony from Rankin, Branin, Barkus, Gant, Palmer, and Fuhrmann. The parties submitted post-trial memoranda of law dated November 24, 2004, and the Court heard Summations on December 17, 2004. Oral Argument was heard on March 14, 2005 and the parties submitted additional letter briefs dated April 29, 2005.

## DISCUSSION

 Pursuant to New York law, a seller of a business and its concomitant good will is indefinitely restrained from impairing that good will and, in effect, "taking back that which he has purported to sell." *Mohawk Maint. Co. v. Kessler,* 52 N.Y.2d 276, 284–85, 419 N.E.2d 324, 328–29, 437 N.Y.S.2d 646, 650–51 (1981). Therefore, a seller of a business cannot "solicit[ ] former customers," *id.* at 284, 419 N.E.2d at 328, 437 N.Y.S.2d at 650, "actively interfere[ ] with the purchaser's relationship with his newly acquired customers by capitalizing upon their personal loyalties to him in an effort to recapture their patronage," *id.* at 285, 419 N.E.2d at 329, 437 N.Y.S.2d at 651, or "avail himself as against the [purchaser] of any special knowledge or advantage derived by him from the business whose good will he has voluntarily sold," *Von Bremen v. MacMonnies,* 200 N.Y. 41, 52, 93 N.E. 186, 190 (1910).

 The seller may, however, "accept the patronage of those customers who were actively dealing with [him] on the date of the sale if such customers choose to leave [the purchaser] without prompting

from [the seller]." *Mohawk Maint. Co.*, 52 N.Y.2d at 287, 419 N.E.2d at 330, 437 N.Y.S.2d at 652. In addition, the seller will not be held liable for those customers whose decision to follow him was caused by something other than improper solicitation on his part. *Hyde Park Prods. Corp. v. Maximilian Lerner Corp.*, 65 N.Y.2d 316, 322, 480 N.E.2d 1084, 1088, 491 N.Y.S.2d 302, 306 (1985).

In this case, plaintiff contends that defendant's various actions amounted to improper inducement and an impairment of the good will which he sold to Bessemer. *See* Pl.'s Post–Trial Mem. at 13–25. Defendant argues that he is not liable because he was simply responding to his clients and did not otherwise act in an improper fashion. *See* Def.'s Post–Trial Mem. at 3–26.

▄ For the reasons set forth below, this Court finds that defendant improperly induced the Palmer account to leave Bessemer and that this inducement in fact caused the Palmer account to leave Bessemer and join Stein Roe. As to all remaining clients, this Court finds that plaintiff has not proven that the improper actions of defendant caused these clients to leave Bessemer and join Stein Roe.

First, the Court finds that Branin intended to take his clients with him from Bessemer to Stein Roe. Branin explained to Barkus that he "had learned from [Grandfield] the right way to transition clients from Bessemer to another firm," Trial Tr. at 597, 599–600, and he discussed with Rankin the limits that the law placed on his solicitation, *id.* at 186, and his desire to transfer $1.5 to $1.8 million in revenues to Stein Roe, *id.* at 141, 265–72; Pl.'s Trial Exs. 55, 60. Despite having discussions about leaving Bessemer as early as Fall 2001, Branin always expressed his desire to wait until the second quarter of 2002, since the contingent payment for cost reductions would be due the Brundage partners at that time. Trial Tr. at 253–59, 554–57. Branin explained to the Court that he waited to earn this payment because "I felt that that was part of what I was due for the sale of my firm and my business to Bessemer." [3] *Id.* at 257. Branin also indicated a desire to "sell my clients again"—a desire which was revealed as nothing short of prescient when just two and a half years later Stein Roe was sold to AMVESCAP.[4] *See id.* at 153, 600–01.

In addition to Branin's stated intent to transfer his clients, the "lift-out template" which marked his move to Stein Roe was completely dependent upon him successfully transferring clients from Bessemer to Stein Roe. *Id.* at 131–32; *see also id.* at 81, 101, 188–90, 195–99, 264–72. As Rankin candidly admitted, in order for the lift-out template to work Branin would need to generate a significant amount of revenue and "[a]dmittedly and predictably, much of that would come from existing clients." *Id.* at 132. The Transition Incentive Arrangement, which was offered ostensibly

---

**3.** As discussed below, Branin apparently did not think that the "sale of my firm and my business to Bessemer" brought with it a duty to refrain from "taking back that which he has purported to sell." *Mohawk Maint. Co.*, 52 N.Y.2d at 284–85, 419 N.E.2d at 328–29, 437 N.Y.S.2d at 650–51.

**4.** Barkus testified that Branin told him that the owners of Stein Roe were considering a sale in the near future. Trial Tr. at 596–97. Although Rankin, in his August 2003 deposition, stated it was neither "a hope or an expectation" that the firm would be sold, *id.* at 156–57, this testimony is incredible given that Rankin had been in discussions for several months with AMVESCAP about an acquisition of Stein Roe, *id.* at 156–72; Pl.'s Trial Ex. 229.

to "share the risk," [5] was calculated to get Branin to move quickly, *see* Trial Tr. at 82–83, in order that the lift-out would be "net profitable for him as well as net profitable for [Stein Roe]," *id.* at 192.

Second, the Court finds that Branin undertook a series of actions designed to carry out his intent to transfer clients to Stein Roe. For instance, despite resoundingly negative feedback, *see* Facts ¶¶ 79–81; Pl.'s Trial Exs. 68, 90, Fuhrmann was hired by Stein Roe without even providing references or recommendations, *see* Trial Tr. at 937–42; Facts ¶ 76.[6] Branin's testimony that he pushed for her to be hired because she was "smart" and "had the potential to be a good portfolio manager," Trial Tr. at 303, and that he offered to pay, in effect, half her salary plus her bonus because it was not "an unfair proposal on [Stein Roe's] part," *id.* at 310, is simply absurd and belied by the evidence. Rankin testified that she was hired primarily to make Branin comfortable, *id.* at 109–25, indicated to his colleagues that "her focus for the first 6+ months would be to help [Branin] transition as much of his client base to [Stein Roe] as possible," Pl.'s Trial Exs. 68, 89, and noted that Branin's intention was to pay Fuhrmann a bonus "'if' *they* successfully transfer $1.5 [million] in revenues," Pl.'s Trial Ex. 89 (emphasis added). In addition, Branin testified that he knew that Bessemer would utilize Fuhrmann in an effort to keep his clients. Trial Tr. at 287. As such, it is clear that Branin pushed for the hiring of Fuhrmann, and willingly absorbed over half of her compensation, as a way to help him transition clients and to frustrate Bessemer's use of someone who was acquainted with approximately 70% of his clients.

Similarly, Branin's standard response to clients regarding his move was designed to help transition those clients to Stein Roe. Despite being aware of Bessemer's approach to investment management, Trial Tr. at 363, 428, 545–46, actively working towards Bessemer's acquisition of Brundage, *id.* at 427–29, 544, and accepting over $15 million from Bessemer for his clients and good will, Facts ¶ 15, Branin told clients that Stein Roe "was far more appropriate for me" and for "my training and experience of 30 years in the business," Trial Tr. at 394–96, 536–37. Although Branin's statement may, in fact, be true, it is nonetheless disingenuous and improper given that he had recently sold his clients and their good will to a firm which he knew all along was not "appropriate" for him or his training and experience.

Finally, shortly after joining Stein Roe, Branin requested that a new schedule of fee rates be approved. *See* Facts ¶¶ 88–90; Pl.'s Trial Ex. 97; Trial Tr. at 341–44. This was done to "push along th[e] process" of transferring accounts, Pl.'s Trial Ex. 97, since obviously having the same fees as at Bessemer would facilitate the movement of clients to Stein Roe, Trial Tr. at 134.[7]

---

5. As plaintiff's counsel pointed out at trial, it is difficult to see how the arrangement caused any risk to be shared since defendant was to be paid his base salary regardless of his performance. Trial Tr. at 83–84. Rankin's contention that this avoided having to pay a guaranteed bonus, *id.* at 86–87, is curious given that Branin's offer letter indicates that portfolio managers at Stein Roe are typically given bonuses calculated at a percentage of their revenues managed—a percentage significant-ly below the 60% offered to Branin, *see* Pl.'s Trial Ex. 75.

6. Fuhrmann described her hiring as "amazing" given the series of events that preceded it. Trial Tr. at 941.

7. Although Rankin testified that when a new portfolio manager joined Stein Roe from another firm it was "standard procedure" and a "professional courtesy" to match the rates

## A. Branin's Liability as to Clients Other Than Glen Raven and Palmer

■ Although the Court is inclined to believe that the above actions, taken together, constitute improper action under *Von Bremen* and *Mohawk Maintenance Co.*, the Court need not reach this issue as to these clients because plaintiff has failed to prove that any improper actions by defendant caused these clients to leave Bessemer and join Stein Roe.[8]

As explained above, plaintiff has the burden of showing that improper actions by defendant *caused* clients to transfer their accounts from Bessemer to Stein Roe, since defendant is free to accept the patronage of those clients who left Bessemer for other reasons. Plaintiff has failed to do that. Plaintiff has offered no proof about which clients spoke to Branin before they transferred their accounts, heard Branin's standard response, were familiar with Fuhrmann, or knew that their fees would be the same at Stein Roe. In fact, even assuming that all of the clients at issue were party to these actions by defendant, no evidence has been presented to show that these clients would not have joined Branin absent these inducements.[9] Therefore, as to these clients, the Court must find that plaintiff failed to carry its burden.

## B. Branin's Liability as to Glen Raven

■ As previously indicated by this Court, plaintiff has also failed to prove that defendant's improper actions caused Glen Raven to transfer its account to Stein Roe. *See* Tr., dated Dec. 17, 2004, at 1067, 1077; Tr., dated Mar. 14, 2005, at 7. Glen Raven initially became a client of Brundage because of Branin, Trial Tr. at 757–58, who was a director on the Board of Glen Raven, *id.* at 681–82, and who was married to Gant's niece, *id.* at 680. Gant testified that so long as Stein Roe was deemed to have the infrastructure necessary to handle the Glen Raven accounts, they would follow Branin. *See* Trial Tr. at 698–99, 757–59. Based on this testimony, this Court is convinced that Gant was intent on following Branin regardless of any action or inaction on his part and therefore nothing Branin did caused the transfer of the Glen Raven account.

## C. Branin's Liability as to Palmer

In addition to hiring Fuhrmann, developing the disingenuous standard response to his clients, and matching the fee rates charged at Bessemer, Branin engaged in

---

paid by clients at their former firm, he also admitted that none of those situations were identical to that presented here—where the portfolio manager joining the firm had sold his client accounts and good will to the firm whose fees Stein Roe was now matching. Trial Tr. at 68–71.

8. In addition to those clients who followed Branin to Stein Roe, approximately $109 million in client assets left Bessemer following Branin's resignation but did not join him at Stein Roe. Facts ¶ 96. While *Mohawk Maintenance Co.* talks of "taking back that which he has purported to sell," *Mohawk Maint. Co.*, 52 N.Y.2d at 284–85, 419 N.E.2d at 328–29, 437 N.Y.S.2d at 650–51, and "recaptur[ing] [his customer's] patronage," *id.* at 285, 419

N.E.2d at 329, 437 N.Y.S.2d at 651, the underlying policy of prohibiting a seller from impairing the good will which he has voluntarily sold would apply equally well when customers take their business to someone other than the seller after they stop doing business with the purchaser because of the seller's improper actions. In this case, however, this theory was not urged upon the Court and no proof was offered to support it.

9. Rankin noted in his testimony that investment management companies have a tenuous hold on their clients because most clients have little attachment to the firm but rather "are there because they are working with the people they want to work with." Trial Tr. at 90.

other behavior that, taken together with his other actions, leave no doubt in this Court's mind that he improperly induced Palmer in violation of *Von Bremen* and *Mohawk Maintenance.*

First, after Palmer requested a meeting at Stein Roe, Branin organized a "dog and pony" and described Palmer, his account, and his investment approach to his Stein Roe colleagues at a strategy meeting. Facts ¶¶ 99–101; Trial Tr. at 146–49, 381–93. Although Branin claimed that the "dog and pony" with Palmer the following week was the "same presentation" they would make to any large prospective client and had not been "tailored" for Palmer, *see* Trial Tr. at 379–81, his testimony is not credible and is belied by the evidence. Armed with information about Palmer that Branin had gathered from years of working with him, *id.* at 381–83, Stein Roe's presenters steered clear of topics in which Palmer had little interest and focused only on those things that were of interest to him, *id.* at 813–14. Not surprisingly, however, the Bessemer presentation, which did not have the benefit of Branin's knowledge, was not as focused and failed to avoid those topics which did not interest Palmer. *Id.* at 778–79, 814–15.

In addition, while defendant's counsel stated that he did not "think Mr. Branin participated very much in [the 'dog and pony'] at all," *id.* at 48, and Rankin and Palmer characterized his role as minor, *id.* at 225, 776–77, 817, significantly Palmer testified that Branin "occasionally amplif[ied] a point if he knew it was something I would be interested in from his relationship with me," *id.* at 776.

Second, following Palmer's request for a specific proposal from Stein Roe, Branin

traveled to Ohio to meet with him. At that meeting, Branin informed Palmer that he would pay the same fees as at Bessemer, *id.* at 405–06, and he took the extraordinary step of naming Rankin, the Chief Executive Officer of Stein Roe and a man with whom Palmer was "very impressed," as "number two" on the Palmer account, *id.* at 782, 787, 816. Tellingly, Branin omitted this information in his testimony to the Court, stating that he told the Palmers that "eventually, that I would—that I would suggest an alternate or a partner that I would work with on the account." *Id.* at 403–04.

■ Taking all these actions together, this Court has no doubt that Branin stepped over the line and improperly induced the Palmers to leave Bessemer and join Stein Roe. Of particular importance, the law in New York is that "it would be bad faith on the part of the [seller] to *avail himself as against the [purchaser] of any special knowledge or advantage derived by him from the business whose good will he has voluntarily sold." Von Bremen,* 200 N.Y. at 52, 93 N.E. at 190 (emphasis added). Clearly, Branin's actions at the strategy meeting and "dog and pony" ran well aground of this prohibition.[10]

As discussed earlier, in order for plaintiff to prevail it must also prove that Branin's improper actions caused Palmer to move his account from Bessemer to Stein Roe. This Court finds that plaintiff has carried that burden.

First, unlike with Gant, this Court is convinced that Palmer's personal relationship with Branin played no role in his decision to transfer his account to Stein Roe. Palmer himself testified that "I have

---

**10.** Defendant's argument that he cannot be found to have acted improperly because he was simply responding to his clients is unpersuasive and not supported by New York law.

*Von Bremen* and *Mohawk Maintenance Co.* place no significance on who initiates the communications between the seller of good will and his now-former clients.

a lot of friends that I do business with and have no trouble separating business and friendship," Trial Tr. at 766, and after witnessing him testify this Court is convinced that Palmer planned to make the most economically astute decision, rather than simply follow his friend.

Second, this Court is convinced that Branin's improper actions did, in fact, persuade Palmer to transfer his account.[11] Following Branin's resignation from Bessemer, Palmer considered both Bessemer and Stein Roe. He and members of his family attended presentations at both firms.[12] Although Palmer was underwhelmed by Bessemer's presentation, *id.* at 825, his reaction must be seen in the context of his having just attended a presentation which was perfectly tailored to his liking by defendant—a man who had worked on the Palmer account since the 1980's, *id.* at 245. Whereas Bessemer made presentations on topics which did not interest Palmer, *id.* at 778–79, 814–15, Stein Roe was able to avoid this stumbling block and to benefit from Branin's ability to "amplify" points which would be of particular interest to Palmer, *id.* at 776, 813–14. Therefore, it is not surprising that following these meetings Palmer was leaning towards transferring the account. *Id.* at 784–85.

Branin's actions following the meetings also clearly persuaded the Palmers. Branin informed the Palmers that they would be paying the same rates as at Bessemer, *id.* at 405–06, which was an important factor for Palmer, *id.* at 787–88, and he named Rankin as the "number two" on the account—a development which Palmer agreed made him "very pleased," *id.* at 816, since he was "very impressed" with Rankin, *id.* Both of these inducements were obviously of importance to Palmer, especially since he sought to make an economically astute decision about his family's account.

Therefore, this Court finds that plaintiff has proven, by a fair preponderance of the evidence, that Branin's improper inducements caused Palmer to transfer his account from Bessemer to Stein Roe.[13]

## CONCLUSION

For the reasons set forth above, the Court finds that, in violation of New York law, defendant impaired the good will in the Palmer account that he had previously sold to plaintiff. As to all other client accounts, the Court finds that plaintiff did not prove by a preponderance of the evidence that defendant's actions caused those clients to transfer their accounts to Stein Roe. A Pre–Trial Conference to discuss defendant's counterclaims and the is-

11. Contrary to defendant's argument that this is equivalent to saying that Palmer was "unwittingly" induced or "entrapped," Letter of Michael I. Bernstein, dated Apr. 29, 2005, at 1, it is actually perfectly consistent with the finding that Palmer planned to make an economically astute decision. Faced with a series of inducements which made Stein Roe seem to be, in effect, a better choice than Bessemer, it made perfect sense for Palmer to be "persuaded" that Stein Roe was the best place to have his account.

12. It should be noted that in the days preceding the "dog and pony" at Stein Roe, Branin delivered his disingenuous standard response

to Thomas Palmer, Carleton's brother. Facts ¶¶ 102–03.

13. Although other factors might have played a role in Palmer's decision, including Palmer's reservations about Barkus serving as lead on the account, *see* Trial Tr. at 781, this Court finds that Branin's actions were the primary cause of Palmer's decision to transfer the account. It should also be noted that while Palmer had reservations about Barkus, he also testified that he "liked Barkus" and thought "[h]e was very intellectually strong." *Id.* at 765.

sue of damages on plaintiff's claim shall occur on May 25, 2006 at 3:00 p.m. in Courtroom 705, 40 Centre Street.

It is SO ORDERED.