08-2462-cv(L)
Bessemer Trust Company, N.A. v. Branin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued:  June 3, 2009                    Decided:  April 5, 2012)

Docket Nos. 08-2462-cv(L), 08-2677-cv(XAP)

-------------------------------------

BESSEMER TRUST COMPANY, N.A.,

Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,

- v -

FRANCIS S. BRANIN, JR.,

Defendant-Counterclaimant-Appellant-Cross-Appellee.

-------------------------------------

Before:   McLAUGHLIN, CALABRESI, and SACK, Circuit Judges.

Appeal by the defendant and cross-appeal by the plaintiff from a judgment of the United States District Court for the Southern District of New York (John E. Sprizzo, Judge) entered after a bench trial.  The district court found the defendant liable to the plaintiff for improper solicitation of a client's account under the so-called "Mohawk doctrine," where that account and its associated "good will" had earlier been transferred to the plaintiff by the defendant and others.  On appeal, we certified a question to the New York Court of Appeals as to the scope of the "Mohawk doctrine."  Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 93-94 (2d Cir. 2010).  In answer to our question, the Court of Appeals concluded, inter alia, that

"while a seller [of a business and its 'good will'] may not contact his former clients directly [to seek to attract them to his new firm], he may, in response to inquiries made on a former client's own initiative, answer factual questions." Bessemer Trust Co., N.A. v. Branin, 16 N.Y.3d 549, 559-60, 949 N.E.2d 462, 470, 925 N.Y.S.2d 371, 379 (2011) (internal quotation marks omitted). In light of this response, we vacate the judgment of the district court in part and remand for further proceedings.

Vacated in part, decision reserved in part, and remanded.

DONALD I. STRAUBER, Chadbourne & Parke LLP (Gretchen N. Werwaiss, Marjory T. Herold, and Bernadette K. Galiano, on the brief), New York, NY, for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.

LOUIS P. DiLORENZO, Bond, Schoeneck & King PLLC (Michael I. Bernstein and Michael P. Collins, on the brief), New York, NY, for Defendant-Counterclaimant-Appellant-Cross-Appellee.

SACK, Circuit Judge:

We return to consider this appeal further, in light of the answer provided by the New York Court of Appeals in Bessemer Trust Co., N.A. v. Branin (Bessemer V), 16 N.Y.3d 549, 949 N.E.2d 462, 925 N.Y.S.2d 371 (2011), in response to a question that we had certified to it in Bessemer Trust Co., N.A. v. Branin (Bessemer IV), 618 F.3d 76, 93-94 (2d Cir. 2010).[1] The issue to

---

[1] In "Bessemer I," the district court found defendant Francis S. Branin, Jr., an investment portfolio manager, liable to Bessemer, a firm to which he had sold "good will," after one

2

which the Court of Appeals gave its attention and to which we now give ours concerns what actions the defendant, a seller of, _inter alia_, the "good will"[2] of a business, may thereafter permissibly take to woo former clients of the business to a competitor under New York law. The facts of this case and its procedural history are set forth at some length in our previous opinion in this appeal, _Bessemer IV_. We recount them here only insofar as we think it necessary to explain our disposition of this appeal in light of the New York Court of Appeals' answer to our certified question.

## BACKGROUND

On August 18, 2000, defendant Francis S. Branin, Jr., an investment portfolio manager and the largest shareholder of the firm of Brundage, Story and Rose, LLC ("Brundage"), sold the assets of the firm along with its client accounts and related

of Branin's former clients transferred his account from Bessemer to Branin's new firm. _See_ _Bessemer Trust Co., N.A. v. Branin_ (_Bessemer I_), 427 F. Supp. 2d 386 (S.D.N.Y. 2006). In "_Bessemer II_," the district court granted Bessemer's motion for summary judgment on Branin's counterclaims. _See_ _Bessemer Trust Co., N.A. v. Branin_ (_Bessemer II_), 498 F. Supp. 2d 632 (S.D.N.Y. 2007). In "_Bessemer III_," the district court fixed the amount of money for which Branin was liable to Bessemer. _See_ _Bessemer Trust Co., N.A. v. Branin_ (_Bessemer III_), 544 F. Supp. 2d 385 (S.D.N.Y. 2008). In "_Bessemer IV_," _inter alia_, we certified a question to the New York Court of Appeals. _See_ _Bessemer Trust Co., N.A. v. Branin_ (_Bessemer IV_), 618 F.3d 76 (2d Cir. 2010). Finally, in "_Bessemer V_," the New York Court of Appeals answered our certified question. _See_ _Bessemer Trust Co., N.A. v. Branin_ (_Bessemer V_), 16 N.Y.3d 549, 949 N.E.2d 462, 925 N.Y.S.2d 371 (2011).

[2] We follow the New York Court of Appeals' style by placing the term "good will" in quotation marks. _See, e.g._, _Bessemer V_, 16 N.Y.3d 549, 949 N.E.2d 462, 925 N.Y.S.2d 371 _passim_.

"good will" to Bessemer. Bessemer IV, 618 F.3d at 80-81. Although Branin originally stayed on at Bessemer as a "client account manager," he soon became dissatisfied with his diminished responsibilities. He left Bessemer to join Stein Roe Investment Counsel LLC ("Stein Roe"), an investment management firm in competition with Bessemer. Id. at 81-82.

In negotiations with Stein Roe, Branin touted his ability to bring his Bessemer clients, most or all of whom originally moved with him as part of the sale of Brundage to Bessemer, to Stein Roe. He indicated "his hope that within twelve months of joining the firm[,] he would be able to transfer [to Stein Roe] $1.5 to $1.8 million of the approximately $2.3 million in [annual] revenue that he was [then] generating for Bessemer." Id. at 82. "He informed Stein Roe that it was possible, however, that few or none of his Bessemer clients would move their business." Id. "Prior to his resignation from Bessemer, Branin refrained from contacting any of his Bessemer clients to inform them of his impending move" or to discuss anything relating to it. Id.

Once Branin joined Stein Roe, that company began crafting and implementing a strategy to entice Branin's former Bessemer clients to move their business to Stein Roe. Id. Part of this strategy involved maintaining Branin's current schedule of fees so that clients would not have their fees increased if they followed Branin to Stein Roe. Id. Additionally, Branin's former assistant at Bessemer, who was otherwise of no interest to

4

Stein Roe as a prospective employee, was hired by the firm "to help Branin transition as much of his client base to Stein Roe as possible." Id. at 84 (brackets and internal quotation marks omitted). "By the following summer, around thirty of Branin's former clients, representing $205 million in assets, had transferred their accounts from Bessemer to Stein Roe, accounting for all but around $23 million of the assets Branin [had] managed at Stein Roe." Id. at 82.

Branin did not initiate contacts with his clients in an effort to assist Stein Roe in its strategy to obtain the Bessemer clients. Id. He did, however, respond to their inquiries if they asked why he left Bessemer. Id. If they requested information about his new firm, he sent them Stein Roe's promotional material. Id. The district court found that "Branin's 'standard' answer to clients who asked why he left Bessemer was that 'a firm like Stein Roe was far more appropriate for me, . . . that the method of dealing with clients, that the approach whereby portfolio managers managed the client portfolios and interacted directly with the clients was more . . . appropriate for my training and experience of 30 years in the business.'" Id. (quoting Bessemer Trust Co., N.A. v. Branin (Bessemer I), 427 F. Supp. 2d 386, 391 (S.D.N.Y. 2006), in turn quoting Joint Statement of Undisputed Facts, Ex. A to Pre-Trial Order dated August 3, 2004) (ellipses in Bessemer I). "Branin did not say or suggest that Stein Roe's approach would be better or more appropriate for any particular client, nor is there

5

[record] evidence that Branin explicitly disparaged Bessemer."
Id.

"The evidence introduced at trial established that Branin had individual meetings, either alone or with other Stein Roe employees participating," with, among others, representatives of the Palmer family, a former client with a large account at Brundage and then at Bessemer. Id. at 82-83. Branin had managed the Palmer account for fifteen to twenty years at Brundage, developing a close personal friendship with Carleton Palmer, III, who represented the family in its dealings with Bessemer. Id. at 83. Branin did not notify Palmer and the Palmer family of his move to Stein Roe. Id. But Palmer did call Branin and ask him questions about the move. Id. Branin's responses were, according to Palmer's testimony, very spare. Id.

"Palmer followed up [on his inquiries] with a letter requesting specific information as to how the Palmer account might be handled at Stein Roe." Id. Palmer and other members of the Palmer family then scheduled back-to-back meetings on August 29, 2002 with Stein Roe and Bessemer to discuss the Palmer account. Id.

Branin helped Stein Roe prepare for these meetings by telling other Stein Roe employees about Carleton Palmer and the Palmers' investment philosophy. Id. According to the trial testimony of Carleton Palmer, during the subsequent meeting between Palmer and Stein Roe, Branin "pretty much sat over in the corner and kept quiet," and "played almost no role," "other than

6

to introduce Carleton Palmer to the firm and occasionally amplify a point if he knew it was something [the Palmers] would be interested in."  Id. (internal quotation marks and citations omitted).

The Palmers thereafter invited Branin to Ohio to make a specific proposal on behalf of Stein Roe.  Id.  Branin accepted.  Id.  During the subsequent visit, "Branin informed the Palmer family that they would pay the same fees at Stein Roe that they were then paying at Bessemer, and that the president of Stein Roe would be the 'number two' on the family account."  Id.

"The next day, . . . September 17, 2002, the Palmer family moved their account to Stein Roe."  Id.

District Court Proceedings

On November 22, 2002, following the departure of the Palmer family and several of Branin's other former Bessemer clients from the firm, Bessemer filed the complaint in this action in New York Supreme Court, New York County.  Id. at 84. "Bessemer asserted claims for breach of contract and breach of Branin's duty of loyalty to Bessemer based on Branin's allegedly improper solicitation of clients and impairment of the [']good will['] which Branin had sold to Bessemer in connection with the sale of Brundage."  Id.  Branin removed the case to the United States District Court for the Southern District of New York based on diversity of citizenship, and filed various counterclaims. Id.

The district court denied the parties' cross-motions for summary judgment on Bessemer's claims, and the case proceeded to a bench trial as to liability.  Id.  The district court issued a memorandum opinion and order on April 10, 2006, concluding that Branin had violated New York law by impairing Bessemer's "good will" in the Palmer account, but that Bessemer had not proven a violation of law by a preponderance of the evidence with respect to any other transferred account.  Bessemer I, 427 F. Supp. 2d at 397-98.  The district court then conducted a separate bench trial on damages, and concluded that Branin was liable to Bessemer in the amount of $826,335 plus prejudgment interest of $402,838, for a total of $1,229,173.  Bessemer III, 544 F. Supp. 2d at 390-93.[3]

Proceedings in this Court

Branin appealed the finding of liability and damages. With respect to the district court's finding of liability as to the Palmer account, we determined that New York law regarding the liability of a seller of "good will" for soliciting former clients -- the so-called "Mohawk Doctrine," named after Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 419 N.E.2d 324, 437 N.Y.S.2d 646 (1981) -- was unclear as applied to the facts of this case.  Bessemer IV, 618 F.3d at 90.  We therefore certified the following question to the New York Court of Appeals:

> What degree of participation in a new
> employer's solicitation of a former

---

[3] The district court also granted Bessemer summary judgment on Branin's counterclaims, Bessemer II, 498 F. Supp. 2d at 639, which we affirmed on appeal, Bessemer IV, 618 F.3d at 91-93.

8

employer's client by a voluntary seller of that client's good will constitutes improper solicitation?  We are particularly interested in how the following two sets of circumstances influence this analysis: (1) the active development and participation by the seller, in response to inquiries from a former client whose good will the seller has voluntarily sold to a third party, in a plan whereby others at the seller's new company solicit the client, and (2) participation by the seller in solicitation meetings where the seller's role is largely passive.

Id. at 94.

### The New York Court of Appeals's Answer to Our Certified Question

The New York Court of Appeals accepted and answered our certified question.  It noted that, "[u]nder New York common law, a seller has an 'implied covenant' or 'duty to refrain from soliciting former customers, which arises upon the sale of the 'good will' of an established business.'"  Bessemer V, 16 N.Y.3d at 556, 949 N.E.2d at 468, 925 N.Y.S.2d at 377 (quoting Mohawk Maintenance Co., 52 N.Y.2d at 283, 419 N.E.2d at 328, 437 N.Y.S.2d at 650).  This covenant, which is effective in perpetuity, is based on the principle that "the vendor is not at liberty to destroy or depreciate the thing which he has sold; there is an implied covenant, on the sale of [']good will['], that the vendor does not solicit the custom which he has parted with; it would be a fraud on the contract to do so."  Id. (quoting Von Bremen v. MacMonnies, 200 N.Y. 41, 50-51, 93 N.E. 186, 189 (1910)).  Thus, the seller of "good will" may not

9

"actively solicit" the customers associated with it.  Id. at 557, 949 N.E.2d at 468, 925 N.Y.S.2d at 377.

Despite these general principles, a buyer of "good will" assumes "certain risks" relating to the continuation of the purchased business.  Id.  Unless the buyer has also secured from the seller of "good will" a binding promise not to compete, the buyer risks loss of customers to him or her.  Id.

Rather than creating a "hard and fast rule [to] determin[e] whether a seller of 'good will' has improperly solicited his former clients" in response to our certified question, the Court of Appeals instructed that "in making this assessment on a case-by-case basis, the trier of fact must consider the principles underlying the rule in Mohawk and the factors involved within the relevant industry that may impair the 'good will' conveyed by the original seller."  Id. at 557, 949 N.E.2d at 469, 925 N.Y.S.2d at 378.

Among the factors to be considered in this inquiry are whether the seller initiated contact with his or her former clients associated with the sold "good will."  "The 'implied covenant' not to solicit former customers bars a seller from taking affirmative steps to directly communicate with them," such as by "send[ing] targeted mailings or mak[ing] individualized telephone calls to his former customers informing them of his new

10

business ventures."[4]  Id. at 557-58, 949 N.E.2d at 469, 925 N.Y.S.2d at 378.

The Court of Appeals explained that while a seller "is not free to tout his new business venture simply because a former client has fortuitously communicated with him first," he is allowed to make certain responses to questioning initiated by the former client.  Id.  The seller "may answer the factual inquiries of a former client, so long as such responses do not go beyond the scope of the specific information sought."  Id. at 558-59, 949 N.E.2d at 469-70, 925 N.Y.S.2d at 378-79.  And "even if prompted," he may not "disparage[] the purchaser of his business."  Id. at 559, 949 N.E.2d at 470, 925 N.Y.S.2d at 379.  Nor may he "explain . . . why he believes his products or services are superior" in response to a question from a former client.  Id.

When the seller of "good will" subsequently joins a firm that competes with the buyer, he may "convey certain information about his former client to his new employer," including "a former client's investment preferences, financial goals, and tolerance of risk."  Id.  However, the seller may not convey to his new employer "information that is proprietary to a purchaser of 'good will.'"  Id.  Should the former client request a "sales pitch" meeting, as the Palmer family did, the seller may

---

[4] The Court of Appeals made clear that the examples of impermissible conduct just discussed are intended to be "illustrative, not exhaustive."  Id.

help his new employer prepare for the meeting and "may be present when such meeting takes place, . . . [s]o long as [his] role is limited to responses to factual matters." Id.

In sum, the Court of Appeals concluded, "while a seller may not contact his former clients directly, he may, 'in response to inquiries' made on a former client's own initiative, answer factual questions[,] . . . [and] assist his new employer in the 'active development . . . [of] a plan' to respond to that client's inquiries. Should that plan result in a meeting with a client, a seller's 'largely passive' role at such meeting . . . [is permissible]." Id. at 559-60, 949 N.E.2d at 470, 925 N.Y.S.2d at 379 (second ellipsis in original; some alterations in original).

**DISCUSSION**

"In reviewing a district court's decision in a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo." White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001). Having reviewed the legal standard applied by the district court and the facts it emphasized in applying it, with the benefit of the Court of Appeals's answer to our certified question, we conclude that the district court's judgment as to Branin's liability must be vacated.

First, the district court placed considerable weight on the fact that Branin intended to transfer his former clients to Stein Roe. It also emphasized the fact that Branin's employment

12

with Stein Roe was consummated with the understanding that he would seek to take his Bessemer clients with him to Stein Roe. See Bessemer I, 427 F. Supp. 2d at 393 ("In addition to Branin's stated intent to transfer his clients, the 'lift-out template' which marked his move to Stein Roe was completely dependent upon him successfully transferring clients from Bessemer to Stein Roe."). While these facts may provide useful background for evaluating the propriety of Branin's actions, the New York Court of Appeals has made it clear that an intent to secure the business of former clients associated with sold "good will" is not ipso facto improper. "[P]rovided that he does not actively solicit" his former customers, Bessemer V, 16 N.Y.3d at 557, 949 N.E.2d at 468, 925 N.Y.S.2d at 377 (emphasis omitted), a seller of "good will" may "assist his new employer in the active development of a plan to respond to" former clients' inquiries, id. at 560, 949 N.E.2d at 470, 925 N.Y.S.2d at 379 (brackets, internal quotation marks, and ellipsis omitted). Those very actions were an important part of Branin and Stein Roe's plan to persuade Bessemer clients associated with the sold "good will" to bring their business to Stein Roe.

The district court, in making its determination, relied significantly on various actions taken by Branin to make Stein Roe attractive to former clients and ease their transition to the firm, but which were not in the nature of active solicitation. These measures included Branin's hiring of his former secretary to assist him in transferring clients, Bessemer I, 427 F. Supp.

13

2d at 394 ("Branin pushed for the hiring of [the former secretary], and willingly absorbed over half of her compensation, as a way to help him transition clients and to frustrate Bessemer's use of someone who was acquainted with approximately 70% of his clients."), and Branin's retention of his fee schedule from Bessemer, id. ("[H]aving the same fees as at Bessemer would facilitate the movement of clients to Stein Roe."). While this conduct may evidence an intent to transfer clients, it is clear from the Court of Appeals's opinion that harboring such an intent, and even taking some action in furtherance of that intent, does not necessarily constitute legally impermissible affirmative solicitation.

The district court also focused on Branin's stock response to former clients, including Carleton Palmer, who called and asked Branin why he moved from Bessemer to Stein Roe. See id. at 396 n.10. The court found that Branin's response, which was that "Stein Roe 'was far more appropriate for me' and for 'my training and experience of 30 years in the business,'" was "disingenuous and improper." Id. at 394 (citation omitted). Whether Branin's response was factual in nature or instead the equivalent of "tout[ing] his new business venture simply because a former client has fortuitously communicated with him first," "disparag[ing]" Bessemer, or explaining "why he believe[d] his products or services [were] superior" to Bessemer's, Bessemer V, 16 N.Y.3d at 558-59, 949 N.E.2d at 469-70, 925 N.Y.S.2d at 378-

14

79, should be considered by the district court in the first instance in light of the New York Court of Appeals's views.

The district court also appeared to place great weight on the fact that Branin helped Stein Roe to organize a "dog and pony" show to entice Palmer to move his business –- "a presentation which" the district court described as "perfectly tailored to [Palmer's] liking by [Branin]." Bessemer I, 427 F. Supp. 2d. at 397. "Armed with information about Palmer that Branin had gathered from years of working with him, Stein Roe's presenters steered clear of topics in which Palmer had little interest and focused only on those things that were of interest to him." Id. at 396 (citations omitted). And as the district court pointed out, this gave Stein Roe a significant advantage over Bessemer when it made a similar presentation to Palmer. Id.

But the Court of Appeals has now made clear that at least some tailoring of presentations to former clients of a seller of "good will" such as Branin is permitted. Such a person "is free to convey certain information about his former client to his new employer," including "a former client's investment preferences, financial goals, and tolerance of risk." Bessemer V, 16 N.Y.3d at 559, 949 N.E.2d at 470, 925 N.Y.S.2d at 379. The Court of Appeals also noted that such a seller of "good will" "may also aid his new employer in preparing for a 'sales pitch' meeting requested by a former client." Id. Indeed, he may "assist his new employer in the active development of a plan to respond to that client's inquiries." Id. at 560, 949 N.E.2d at

15

470, 925 N.Y.S.2d at 379 (brackets, internal quotation marks, and ellipsis omitted).

Similarly, the district court found it "significant[]" that, although Palmer described Branin's role in the "dog and pony" show as "minor," Palmer testified that "Branin 'occasionally amplif[ied] a point if he knew it was something I would be interested in from his relationship with me." Bessemer I, 427 F. Supp. 2d at 396 (citation omitted).  The Court of Appeals said explicitly that a seller of "good will" "may be present when such [a] meeting takes place." Bessemer V, 16 N.Y.3d at 559, 949 N.E.2d at 470, 925 N.Y.S.2d at 379.  On remand, the court should therefore consider whether Branin's "role" at the sale presentation was "limited to responses to factual matters," id., and thus permissible.  The court should also make this determination with respect to Branin's subsequent meeting with Carleton Palmer in Ohio, during which Branin "informed Palmer that he would pay the same fees as at Bessemer," and that William Rankin, "the Chief Executive Officer of Stein Roe and a man with whom Palmer was 'very impressed,' [would be the] 'number two' on the Palmer account" if he moved to Stein Roe.  Bessemer I, 427 F. Supp. 2d at 396 (citation omitted).

Finally, the district court rejected Branin's argument that "he cannot be found to have acted improperly because he was simply responding to his clients."  427 F. Supp. 2d at 396 n.10. The court thought this argument "unpersuasive and not supported by New York law" because the leading cases "place no significance

16

on who initiates the communications between the seller of [']good will['] and his now-former clients." Id. (emphasis added). But, in answering our certified question, the Court of Appeals explained to the contrary that "[a] trier of fact ought to consider whether, following the sale of a business and its [']good will,['] a seller initiated contact with his former customers or clients. Such initiation is particularly relevant where a seller, like Branin, remains in the industry." Bessemer V, 16 N.Y.3d at 557, 949 N.E.2d at 469, 925 N.Y.S.2d at 378. (emphases added).

We conclude, with the benefit of the Court of Appeals's additional guidance (which was, of course, unavailable to the district court at the time it was considering this case), that the court's understanding of New York law was clearly in error. We must therefore vacate the judgment of the district court, insofar as it reflects the court's finding of liability against Branin, and remand the matter to the district court for it to apply New York law in accordance with the legal precepts set forth in the New York Court of Appeals' answer to our certified question and, of course, with the opinions of this Court.

"We express no view on how the district court should resolve the matter . . . . We merely conclude that, in light of the rulings of the New York Court of Appeals on the certified questions, the district court's [judgment] . . . can no longer stand." Commodity Futures Trading Comm'n v. Walsh, 658 F.3d 194, 199-200 (2d Cir. 2011). It will be for the district court in the

17

first instance on remand to decide whether this case in its current posture is best suited for summary judgment practice or for trial. Should this matter come before this Court again, we will review the district court's decision under the ordinarily applicable standards of deference.

In our prior opinion, we "reserve[d] decision on the correct method for the calculation of damages" pending the New York Court of Appeals answer to our certified question. Bessemer IV, 618 F.3d at 91. Because we determine that the district court's finding of liability must be vacated and the case remanded for further proceedings, we again reserve decision on the issue of damages. We will consider the issue, if necessary, if the district court finds Branin liable on Bessemer's claim and the case is brought before us on appeal.

**CONCLUSION**

For the foregoing reasons, we vacate the district court's judgment insofar as it found Branin liable to Bessemer, and we remand to that court for further proceedings consistent with this opinion and the New York Court of Appeals's opinion answering our certified question. Any further appeal to this Court in this case shall be assigned by the Clerk of Court to a new panel (whether or not including one or more members of the current panel) in the ordinary course.

Each party shall bear its or his own costs on appeal.