08-2462-cv(L), 08-2677(XAP)
Bessemer Trust Company, N.A. v. Branin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: June 3, 2009     Question Certified: August 24, 2010)

Docket Nos. 08-2462-cv(L), 08-2677-cv(XAP)

-------------------------------------

BESSEMER TRUST COMPANY, N.A.,

Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,

- v -

FRANCIS S. BRANIN, JR.,

Defendant-Counterclaimant-Appellant-Cross-Appellee.

-------------------------------------

Before:   McLAUGHLIN, CALABRESI, and SACK, Circuit Judges.

Appeal by the defendant and cross-appeal by the plaintiff from a judgment of the United States District Court for the Southern District of New York.  The district court (John E. Sprizzo, Judge) made three rulings relevant to this appeal. First, it found the defendant liable to the plaintiff for improper solicitation of a client's account where that account had earlier been transferred to the plaintiff by, inter alios, the defendant, in violation of the so-called "Mohawk doctrine." Second, the court granted summary judgment dismissing the defendant's counterclaims against the plaintiff for breach of contract, for promissory estoppel, and in quantum meruit.  Third, it awarded damages to the plaintiff based on a "return of

capital" rather than a "lost profits" theory.  We certify to the New York Court of Appeals a question of New York law relevant to the determination of the defendant's liability under the Mohawk doctrine, affirm the dismissal of the counterclaims, and reserve decision on the question of damages pending a response from the Court of Appeals.

Affirmed in part, question certified in part, decision reserved in part.

DONALD I. STRAUBER, Chadbourne & Parke LLP (Gretchen N. Werwaiss, Marjory T. Herold, and Bernadette K. Galiano, of counsel), New York, N.Y., for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.

LOUIS P. DiLORENZO, Bond, Schoeneck & King PLLC (Michael I. Bernstein and Michael P. Collins, of counsel), New York, N.Y., for Defendant-Counterclaimant-Appellant-Cross-Appellee.

SACK, Circuit Judge:

The defendant Francis S. Branin, Jr., a former principal in an investment management firm, and his partners sold their firm and its good will to another investment management firm, the plaintiff Bessemer Trust Company, N.A. ("Bessemer"). Soon dissatisfied with his employment at Bessemer, Branin left and joined a competitor.  He did not contact his former clients in search of their business directly, but he did respond to their inquiries as to his status.  He also participated in at least two in-person meetings with respect to one client, and helped craft his new firm's strategy for soliciting that client's business.

When this client and several others stopped doing business with Bessemer to do business with Branin's new firm instead, Bessemer brought the instant lawsuit, alleging that Branin had solicited his former clients at Bessemer in violation of the doctrine established by Von Bremen v. MacMonnies, 200 N.Y. 41, 93 N.E. 186 (1910) and Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 419 N.E.2d 324, 437 N.Y.S.2d 646 (1981) (the "Mohawk doctrine"), which prohibits, in perpetuity, a voluntary seller of a client's good will from improperly soliciting business from that client after the client's business, including its good will, is transferred to the purchaser. Branin filed counterclaims against Bessemer for breach of contract, in quantum meruit, and for promissory estoppel.

After a bench trial in the United States District Court for the Southern District of New York, the court (John E. Sprizzo, Judge) concluded that Branin had improperly solicited one former client, but found insufficient evidence of improper solicitation with respect to the others. Instead of trying Branin's counterclaims, the court granted Bessemer summary judgment dismissing them. Finally, after a second trial on damages, the court adopted a "return of capital," rather than a "lost profits," theory upon which it awarded Bessemer $1,229,173.20 in damages and pre-judgment interest.

Branin appeals, contesting the finding of liability, the award of damages and the dismissal of his counterclaims.

3

Bessemer cross-appeals with respect to the calculation of damages.

The principal legal question before us depends not on interpretation of contract law, but on application of a branch of New York tort law, the Mohawk doctrine. We find insufficient guidance in New York case law to establish whether Branin's behavior constituted actionable improper solicitation under that law. We therefore certify to the New York Court of Appeals that question. Inasmuch as an answer to this question is dispositive of a finding of liability in this case, and is therefore also a threshold question that must be answered before any damages may be awarded, we need not, and choose not to, decide at this time whether the district court properly calculated damages.

Branin's promissory estoppel and quantum meruit claims have been waived on appeal. We affirm the dismissal of his breach of contract counterclaims because, for reasons we will explain, as an at-will employee, he cannot prevail on them based on diminution of his responsibilities and because his claim for failure to provide an adequate bonus is without merit as his offer letter explicitly vested Bessemer with the sole discretion as to whether to pay him a bonus, and if so, in what amount.

**BACKGROUND**

Defendant Francis S. Branin, Jr., an investment portfolio manager, joined the investment management firm of Brundage, Story and Rose, LLC ("Brundage") in 1977, rose to the level of principal in the firm by 1982, served as Chief Executive

Officer from 1996 until 2000, and at the time of the events in question, held the largest share of the firm.

In October 2000, pursuant to a purchase agreement dated August 18, 2000, (the "Purchase Agreement") Branin and the seven other principals in Brundage sold the assets of the firm, including its client accounts and related good will, to Bessemer for more than $75 million. Branin, in view of his substantial ownership of Brundage and as one of the lead negotiators for Brundage with respect to the sale, had substantial involvement in arranging the sale. All the principals were to be employed by Bessemer at will thereafter. They obtained no ownership stake in the new firm.

In an effort to ensure that the Brundage principals devoted their energies to transferring their client accounts to Bessemer and retaining those accounts, the Purchase Agreement provided that only a portion of the purchase price would be guaranteed -- an initial payment of $50 million, of which Branin received more than $9.1 million and that further payments could be earned upon the meeting of certain benchmarks for client retention, revenue enhancements, and reduction of expenses. The Brundage principals thereafter earned two such contingency payments, one for $10 million in September 2001 in return for their meeting client account transfer benchmarks from Brundage to Bessemer, and a payment of approximately $15 million in April 2002 because of a successful reduction of expenses. Branin received nearly one quarter of each of these two payments.

It soon became clear, however, that Branin and the other former Brundage principals would not be eligible for the remaining two contingency payments, in large measure because one of the former principals, Cheryl Grandfield, departed the firm in January 2001. She actively and successfully solicited many of her clients to follow her. That had a serious adverse effect on the ability of the remaining seven principals to meet the final two contingency-payment benchmarks.

Bessemer subsequently brought suit against Grandfield for improper solicitation of clients, alleging the same principal theory of liability that it asserts here. Grandfield settled that lawsuit, agreeing to repay her entire share of the payments she had received from the sale of Brundage.

Branin soon became unsatisfied with his role at Bessemer. Several factors in addition to the fact that he would not be eligible for any further contingency payments appear to have contributed to his dissatisfaction at Bessemer. In contrast to his role at Brundage, where he had actively managed the portfolios of his clients, for example, at Bessemer, Branin was a "client account manager" without the authority to make investment decisions himself. And less than two weeks after the closing of the Brundage transaction, Bessemer's CEO left the firm. His replacement reduced Branin's responsibilities, excluding him from management meetings. Branin understood this effectively to be a demotion.

Branin was also apparently upset by the fact that Bessemer had made minimal effort to introduce him to its new or existing client base and did not involve him in any of the firm's business development projects. Finally, and relevant to Branin's counterclaims in this case, when bonuses were distributed for year-end 2001, Branin received a far smaller bonus as a percentage of his potential target bonus than did the other former Brundage principals.[1]

### Branin's Move to Stein Roe

Branin then engaged a consulting firm to explore moving, with his business, from Bessemer to another firm. The consultants brought Branin to Stein Roe Investment Counsel LLC ("Stein Roe"), a competing investment management firm. For several months, Branin and Stein Roe negotiated toward a possible deal between them. Branin explicitly described for Stein Roe his client base at Bessemer and touted his ability to bring his Bessemer clients with him.

In or prior to June 2002, Branin agreed to move to Stein Roe. At that time, Branin indicated to Stein Roe his hope that within twelve months of joining the firm he would be able to transfer $1.5 to $1.8 million of the approximately $2.3 million in revenue that he was then generating for Bessemer to Stein Roe. He informed Stein Roe that it was possible, however, that few or

---

[1] Branin was also miffed that he had been excluded from a Bessemer holiday celebration despite the fact that each of the other former Brundage principals was invited.

none of his Bessemer clients would move their business.  Prior to his resignation from Bessemer, Branin refrained from contacting any of his Bessemer clients to inform them of his impending move.

On July 12, 2002, Branin resigned from Bessemer.  After his resignation, Branin took limited action to assist Bessemer in client retention, providing the firm with a memorandum profiling each of his accounts and the contact person for each account.

Attempts To Bring Clients to Stein Roe

At the time Brundage was sold to Bessemer, Branin managed about $450 million in investments, more than ten percent of the approximately $4.1 billion managed by Brundage immediately prior to the sale.  Once Branin joined Stein Roe, the company began crafting and implementing a strategy to entice Branin's former Bessemer clients -- most or all of whom had come to Bessemer with him from Brundage -- to move their business to Stein Roe.  This strategy included a new schedule of fee rates to be charged to clients that followed Branin, under which clients' fees would not thereby be increased.  He and Stein Roe had some initial success.  By the following summer, around thirty of Branin's former clients, representing $205 million in assets, had transferred their accounts from Bessemer to Stein Roe, accounting for all but around $23 million of the assets Branin managed at Stein Roe.

Branin did not contact his clients directly to ask them to follow him to Stein Roe.  He did, however, respond to their inquiries when they asked why he left and, if they requested

8

information about the new firm, he sent them material about his new firm.  According to the district court's memorandum opinion and order, Branin's "standard" answer to clients who asked why he left Bessemer was that "'a firm like Stein Roe was far more appropriate for me, . . . that the method of dealing with clients, that the approach whereby portfolio managers managed the client portfolios and interacted directly with the clients was more . . . appropriate for my training and experience of 30 years in the business.'"  Bessemer Trust Co., N.A. v. Branin, 427 F. Supp. 2d 386, 391 (S.D.N.Y. 2006)("Bessemer I") (quoting Joint Statement of Undisputed Facts, Exh. A to Pre-Trial Order dated August 3, 2004) ("Joint Statement of Undisputed Facts") (ellipses in original).  Branin did not say or suggest that Stein Roe's approach would be better or more appropriate for any particular client, nor is there evidence that Branin explicitly disparaged Bessemer.

The evidence introduced at trial established that Branin had individual meetings, either alone or with other Stein Roe employees participating, with representatives of two former clients with accounts at Bessemer: the Palmer family and Glen Raven, Inc.  Their accounts were in the approximate amount of $117 million and $16 million, respectively.

The Palmer Family Account

The Palmer family had been a Brundage client since the 1930s.  During the fifteen to twenty years Branin had managed the account there, he developed a close friendship with Carleton

9

Palmer, III, who represented the family for these purposes. The two men, along with their wives and children, socialized and vacationed together, and they owned homes in the same community and jointly owned a small fishing boat.

Branin nonetheless did not notify Carleton Palmer or the Palmer family of his move from Bessemer to Stein Roe, nor did he contact them directly after the move. Indeed, the Palmer family first learned of Branin's change of employment through an employee of Bessemer.

Upon learning of Branin's move to Stein Roe, Carleton Palmer called Branin at his home to get his account of the situation -- one that, Palmer testified, was very spare. Palmer followed up with a letter requesting specific information as to how the Palmer account might be handled at Stein Roe. Members of the Palmer family then scheduled back-to-back meetings on August 29, 2002, with Stein Roe and Bessemer to discuss the Palmer account.

In anticipation of the meeting and at Branin's instance, Branin and other Stein Roe employees prepared "what he described as a 'dog and pony [show]' for a 'LARGE client relationship that I am hoping will join [Stein Roe].'" **Bessemer I, 427 F. Supp. 2d at 391 (quoting Pl.'s Trial Ex. 103, e-mail from Branin to Ronald Fisher and Eric Propper** dated August 2, 2002) (first brackets added; block caps in original). On August 22, 2002, Stein Roe held a strategy session organized by Branin

10

during which he provided other Stein Roe employees with information about Carleton Palmer and about the nature of, and investment philosophy for, the Palmer account. According to the trial testimony of Carleton Palmer, during the subsequent meeting between Palmer and Stein Roe, Branin "played almost no role," Trial Tr. at 817, and "pretty much sat over in the corner and kept quiet," id. at 776-77, other than to introduce Carleton Palmer to the firm and "occasionally amplify a point if he knew it was something [the Palmers] would be interested in," id. at 776.

Following the meetings, the Palmer family remained unsure about whether to move their investment accounts to Stein Roe. The Palmers therefore invited Branin to Ohio to make a specific proposal on behalf of that company, an invitation which he accepted. During that visit, Branin informed the Palmer family that they would pay the same fees at Stein Roe that they were then paying at Bessemer, and that the president of Stein Roe would be the "number two" on the family account. Id. at 787, 816. The next day, on September 17, 2002, the Palmer family moved their account to Stein Roe. Carleton Palmer testified that he chose Stein Roe over Bessemer because he was more impressed by Stein Roe's senior management. He also thought that he would be "a much more important client at Stein Roe" because the firm had fewer large clients than Bessemer, making the family account "a big fish in a small pond." Id. at 785.

Branin's Assistant

11

It was important to Branin that his principal assistant at Bessemer, Alexandra Fuhrmann, join him at Stein Roe. Shortly after Branin informed his staff at Bessemer of his decision to leave the firm, Fuhrmann contacted Stein Roe to seek employment there. Although granted an interview, she was initially told there were no positions available. Three days later, Fuhrmann was nonetheless invited to, and did, attend additional interviews with the president of Stein Roe and others at the company. Her interviews went poorly. Interviewers thought that she had an "unfortunate personality," and an "overly aggressive" demeanor, and that "[i]n a vacuum, [Stein Roe] would never hire her." **Bessemer I**, **427 F. Supp. 2d** at 389 (internal citations omitted).

Nevertheless, on August 2, 2002, Fuhrmann was offered a position as a vice president. The president of Stein Roe explained her hiring as a way to make Branin comfortable and to assist in administrative work. However, it was understood that her primary responsibility would be "'to help [Branin] transition as much of his client base to [Stein Roe] as possible,'" id. at 394 (quoting Pl.'s Trial Exs. 68, 89) (alteration in original), and that this was part of the reason that Branin had recommended she join Stein Roe, see Pl's Trial Ex. 69.

Meanwhile, Bessemer, unaware of Fuhrmann's attempts to join Stein Roe, assigned her increasing responsibility in an effort to retain Branin's clients, including promoting her to senior client account manager with respect to several accounts,

12

and informing several customers that she would be assuming day-to-day responsibility for their accounts. According to one of Fuhrmann's supervisors at Bessemer, partner Paul Barkus, when Fuhrmann subsequently left Bessemer to join Stein Roe, on August 2, 2002, her departure made Bessemer "'look[] kind of foolish to the clients.'" Bessemer I, 427 F. Supp. 2d at 390 (quoting Trial Tr. at 609). And Barkus told Fuhrmann that he "'thought the only reason that [Branin] and Stein Roe wanted her to go to Stein Roe was to help [Branin] transfer accounts from Bessemer to Stein Roe.'" Id. (quoting Trial Tr. at 594) (alteration in original).

The Complaint and Counterclaims

On November 22, 2002, after Fuhrmann and several of Branin's former Bessemer clients had departed the firm, Bessemer filed the complaint in this action in the Supreme Court of New York County. Bessemer asserted claims for breach of contract and breach of Branin's duty of loyalty to Bessemer based on Branin's allegedly improper solicitation of clients and impairment of the good will which Branin had sold to Bessemer in connection with the sale of Brundage. Branin removed the case to the United States District Court for the Southern District of New York on diversity grounds. He then filed counterclaims for breach of contract relating to his position at Bessemer, breach of contract with respect to his bonus, quantum meruit, and promissory estoppel based on the sale of Brundage and his associated offer of employment by Bessemer.

Motions and Trials

13

After pre-trial discovery was complete, the parties each brought a motion for summary judgment. These were denied. The case proceeded to a bench trial as to Branin's liability on Bessemer's claim. Following the completion of trial, the filing of post-trial memoranda of law, summations by the parties, oral argument, and additional letter briefs, the district court issued a memorandum opinion and order on April 10, 2006, concluding that Branin violated New York law by impairing Bessemer's good will in the Palmer account, but that Bessemer had not proven a violation of law by a preponderance of the evidence with respect to any other transferred account. Bessemer I, 427 F. Supp. 2d at 397-98.

Bessemer then moved for summary judgment on Branin's counterclaims. In February 2007, and by a subsequent memorandum opinion and order, the court granted Bessemer's motion. See Bessemer Trust Co., N.A. v. Branin, 498 F. Supp. 2d 632, 639 (S.D.N.Y. 2007) ("Bessemer II"). Recognizing that Branin's employment contract was terminable at will and that Branin "had no contractual right to a bonus above 0% of his salary and [that] his bonus was clearly within the discretion of [Bessemer]," id. at 639, the court concluded that Branin's counterclaims were based on an "erroneous interpretation of the Purchase Agreement," id. at 637.

The court then conducted a separate bench trial on damages. It rejected Bessemer's "lost profits" theory of damages and accepted Branin's "return of capital" theory, concluding that

14

Branin was liable to Bessemer in the amount of $826,335 plus prejudgment interest of $402,838 for a total of $1,229,173. Bessemer Trust Co., N.A. v. Branin, 544 F. Supp. 2d 385, 390-93 (S.D.N.Y. 2008) ("Bessemer III").

Branin appeals as to the district court's finding of liability with respect to the Palmer account, the award of damages, and the grant of summary judgment dismissing his counterclaims. Bessemer cross-appeals as to the district court's calculation of damages.

**DISCUSSION**

I.    Standards of Review

"In reviewing a district court's decision in a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo." White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001); accord Amalfitano v. Rosenberg, 533 F.3d 117, 123 (2d Cir. 2008). "Under the clearly erroneous standard, there is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence. We will not upset a factual finding unless we are left with the definite and firm conviction that a mistake has been committed." White, 237 F.3d at 178 (internal quotation marks omitted).

Similarly, in reviewing a grant of summary judgment, we review questions of law and mixed questions of law and fact de novo, McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202, 204 (2d Cir. 2007), and review a district court's factual findings

15

for clear error, City of N.Y. v. Agni, 522 F.3d 279, 282 (2d Cir. 2008). "[C]onstruing the evidence in the light most favorable to the nonmoving party," Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003), we may affirm only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A] fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" Mitchell, 350 F.3d at 47 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248).

Finally, with respect to the district court's determination of damages, we review the legal question of the applicable damages measurement de novo. See Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 494 (2d Cir. 1995). The question of "the amount of recoverable damages is a question of fact," however, that we review for clear error. Lucente v. IBM Corp., 310 F.3d 243, 261 (2d Cir. 2002) (quotation marks omitted).

II. Improper Solicitation of Clients After Voluntary Sale of Good Will Under New York Law

The Mohawk doctrine, derived from the New York Court of Appeals decisions in Von Bremen v. MacMonnies, 200 N.Y. 41, 93 N.E. 186 (1910) and Mohawk Maint. Co. v. Kessler, 52 N.Y.2d 276, 419 N.E.2d 324, 437 N.Y.S.2d 646 (1981), recognizes as part of

16

the common law of New York a "so-called 'implied covenant' [by a seller] to refrain from soliciting former customers following the sale of the 'good will' of a business," Mohawk, 52 N.Y.2d at 284, 419 N.E.2d at 328, 437 N.Y.S.2d at 650. "This 'implied covenant' . . . precludes [the seller] from approaching his former customers and attempting to regain their patronage after he has purported to transfer their 'good will' to his purchaser." Id.; see also Von Bremen, 200 N.Y. at 52, 93 N.E. at 190 (finding that "a voluntary assignor of the good will of a business" may not "solicit trade from [his] old customers"). The basis for the rule was described by reference to English common law in Von Bremen:

> "A man may not derogate from his own grant; the vendor is not at liberty to destroy or depreciate the thing which he has sold; there is an implied covenant, on the sale of good will, that the vendor does not solicit the custom which he has parted with; it would be a fraud on the contract to do so. . . . It is not right to profess and to purport to sell that which you do not mean the purchaser to have; it is not an honest thing to pocket the price and then to recapture the subject of sale; to decoy it away or call it back before the purchaser has had time to attach it to himself and make it his very own."

Von Bremen, 200 N.Y. at 50-51, 93 N.E. at 189 (quoting Lord MacNaghten's opinion in Trego v. Hunt, (1896) 21 App. Cas. 7).

"[T]he right acquired by the purchaser of the 'good will' of a business by virtue of this 'implied covenant' [is] a permanent one [and] is not subject to divestiture upon the passage of a reasonable period of time," since there is a

17

continuing duty upon the seller "imposed by law in order to prevent the seller from taking back that which he has purported to sell."  Mohawk, 52 N.Y.2d at 284-85, 419 N.E.2d at 329, 437 N.Y.S.2d at 651; accord Borne Chem. Co., Inc. v. Dictrow, 85 A.D.2d 646, 650, 445 N.Y.S.2d 406, 413 (2d Dep't 1981) ("A cause of action for wrongful diversion of good will previously sold to a plaintiff by a defendant sounds in breach of an implied covenant of the contract of sale that the seller will permanently refrain from soliciting his prior customers.").

> When the intangible asset of good will is sold along with the tangible assets of a business, the purchaser acquires the right to expect that the firm's established customers will continue to patronize the business.  The essence of the transaction [of the sale of good will] is, in effect, an attempt to transfer the loyalties of the business' customers from the seller, who cultivated and created them, to the new proprietor.

Mohawk, 52 N.Y.2d at 285, 419 N.E.2d at 329, 437 N.Y.S.2d at 651 (internal citations omitted).

This duty of the seller not to solicit customers does not, however, include an obligation not to accept such of his former customers as may choose to follow him to his new employment.  See id., 52 N.Y.2d at 287, 419 N.E.2d at 330, 437 N.Y.S.2d at 652 (recognizing that the seller "may accept the patronage of those customers who were actively dealing with [the purchased company] on the date of the sale if such customers choose to leave [the purchased company] without prompting from [the seller]").

18

The New York Court of Appeals has drawn an "important distinction between the duty to refrain from soliciting customers" on the one hand, which arises by operation of law upon the sale of good will, and the "separate duty to refrain from competing with the purchaser, which may only arise out of an express agreement." Id., 52 N.Y.2d at 283, 419 N.E.2d at 328, 437 N.Y.S.2d at 650.[2] "When a business is sold, the purchaser acquires no legal right to expect that the seller will refrain from engaging in a competing enterprise." Id. Rather, "the seller remains free to pursue his own economic interests without restraint unless the purchaser has managed to extract from him an express promise to refrain from competing." Id. This includes the right to contract with the seller's former customers, provided that there is no improper solicitation, and, "[i]ndeed, the occurrence of a certain amount of attrition is one of the risks that the purchaser must assume when he acquires an established business." Id., 52 N.Y.2d at 285, 419 N.E.2d at 329, 437 N.Y.S.2d at 651. So long as the client's decision to follow the seller "did not come about through improper solicitation," the implied covenant is not violated and the lost account "should not be considered in ascertaining plaintiffs' damages." Hyde

---

[2] The parties might have, but did not, negotiate a non-competition agreement upon the sale of Brundage to Bessemer. And competitive behavior does not, in and of itself, trigger application of the implied covenant attached to the sale of good will inasmuch as this "'implied covenant' imposes a much narrower duty than do express covenants purporting to restrict the seller's right to compete." Mohawk, 52 N.Y.2d at 284, 419 N.E.2d at 328, at 437 N.Y.S.2d at 650.

19

*Park Prods. Corp. v. Maximilian Lerner Corp.*, 65 N.Y.2d 316, 322, 480 N.E.2d 1084, 1088, 491 N.Y.S.2d 302, 306 (1985).

The difficulty lies, of course, in determining what actions constitute "improper solicitation," an issue upon which New York courts offer somewhat limited guidance. In the case before us, Branin argues that he did not solicit any clients because he was simply responding to their inquiries.[3] Bessemer counters that "even if a former customer made the initial contact, Branin was prohibited from taking any action that would tend in any way to exploit a client's established loyalties or to prompt or encourage the client to leave Bessemer," Appellee's Br. at 27-28, and that Branin could accept former clients' business "only if they left Bessemer and joined him at Stein Roe 'without prompting' or 'any act' from Branin," id. at 28. The district court took a middle path, concluding that Bessemer had established that Branin's solicitation was improper as to the Palmer account, but that there was insufficient evidence to demonstrate solicitation of any other account, including the Glen Raven account, with whose representative Branin also met in

---

[3] Branin also argues that his actions were permissible because they assisted the clients in making informed choices, as is each client's right under the Investment Advisor Act of 1940. Branin has cited no case law that suggests, let alone holds, that the right of the client to make an informed choice would permit improper solicitation of that client. The argument does not help answer the basic question: whether Branin improperly solicited his clients.

person while at Stein Roe.[4]  Bessemer I, 427 F. Supp. 2d. at 395-98.

We find no clear error in the district court's finding of fact "that Branin intended to take his clients with him from Bessemer to Stein Roe." Id. at 393. Branin himself stated that he "'had learned . . . the right way to transition clients from Bessemer to another firm.'" Id. (quoting Trial Tr. at 597, 599-600). He expressed his desire to transfer $1.5 to $1.8 million in revenue from Bessemer to Stein Roe. Id.

Once at Stein Roe, as noted above, Branin took actions both to help Stein Roe solicit his clients and to frustrate Bessemer's ability to retain them. Most prominently, he called a meeting for the express purpose of devising a strategy to solicit the Palmer family business, requested a new schedule of fees for his former clients so as to entice them to move, held in-depth discussions with employees at Stein Roe in which he described his clients at Bessemer and what would motivate them to move their business to Stein Roe, and participated in both phone and in-person meetings with his former clients during which he discussed his reasons for moving from Bessemer to Stein Roe.

Branin's principal assistant at Bessemer, whose intimate knowledge of Branin's clients would likely have been of

---

[4] The district court also noted that Bessemer had not advanced, and the court therefore did not consider, any argument as to clients that left Bessemer but did not join Stein Roe, even though the court believed that such an argument could have been cognizable under Mohawk. Bessemer I, 427 F. Supp. 2d. at 395 n.8.

significant benefit to Bessemer in its effort to retain Branin's accounts -- a fact of which Branin testified he was aware, was hired by Stein Roe despite receiving thoroughly negative reviews during her interviews and without having submitted any references or recommendations, because the president of Stein Roe believed that she could "help [Branin] transition as much of his client base to [Stein Roe] as possible." Id. at 394 (quotation marks and citation omitted, alteration in original). Indeed, this was part of the reason that Branin initially suggested that Stein Roe hire her, and her hiring was important enough to Branin that he offered to pay a portion of her salary at Stein Roe out of his own pocket.

The district court's not-clearly-erroneous finding was that Branin's input helped "Stein Roe's presenters [to] steer[] clear of topics in which Palmer had little interest and focus[] only on those things that were of interest to him." Bessemer I, 427 F. Supp. 2d at 396. And Carleton Palmer, the family representative, testified that Branin "occasionally amplif[ied] a point if he knew it was something I would be interested in from his relationship with me." Trial Tr. at 776. Branin then traveled to Ohio for a second meeting with Palmer, in which he presented the Palmer family with a proposed fee schedule and promised the CEO of Stein Roe as the "number two" on the account. Id. at 786-87.

None of this behavior by Branin requires a conclusion under New York law as we understand it, however, that Branin

22

"solicited" Palmer as a client. As the district court correctly noted, other than Palmer and Glen Raven, Bessemer "has offered no proof about which clients spoke to Branin before they transferred their accounts, heard Branin's standard response, were familiar with Fuhrmann, or knew that their fees would be the same at Stein Roe." Bessemer I, 427 F. Supp. 2d at 395. Even had "all of the clients at issue [been] party to these actions by defendant, no evidence has been presented to show that these clients would not have joined Branin absent these inducements." Id. And inasmuch as the Palmer family transferred their account only after Stein Roe was able to demonstrate, in a meeting in which Branin took part, that the firm would be a superior investment manager in light of the family's investment needs, we think it relevant that New York law permits several steps Bessemer might have pursued to protect itself in this regard, including non-competition and non-solicitation agreements that could have been, but were not, entered into with the Brundage principals at the time of the sale of the firm to Bessemer.

The district court implicitly recognized what we think to be so: The fact that Branin participated in the meetings relating to the departure of the Palmer family to Stein Roe does not necessarily demonstrate that he was engaged in improper solicitation because, as was the case with the Glen Raven account with respect to which Branin also held an in person meeting while at Stein Roe, there is no conclusive proof or finding of a causative link between what Branin did and the family's decision

23

to change investment advisors.  See id. (finding, despite the fact that Branin had participated in a meeting with Glen Raven discussing the moving of the account to Stein Roe, that there was no solicitation because Glen Raven "was intent on following Branin regardless of any action or inaction on his part and therefore nothing Branin did caused the transfer of the Glen Raven account").  Under the circumstances, the Palmer family may well have followed in any event.

The district court found that, "[t]aking all these actions together," it had "no doubt that Branin stepped over the line and improperly induced the Palmers to leave Bessemer and join Stein Roe."  Id. at 396.  We recognize that these actions are far from passive acceptance of a client's inquiries, but we lack the clarity of conviction of the district court on this point.[5]

---

[5]  We also harbor a concern as to how our decision here might affect a situation where the defendant has left to establish his or her own, new business, rather than for another firm.  In that case, former clients would indisputably be free to contact the start-up firm to discuss the prospect of transferring their accounts, provided that there was no improper solicitation on the hypothetical defendant's part.  Unless we were to reach the highly unlikely conclusion that a voluntary seller of good will could never start a competing, solo practitioner business and receive former clients that wished to join him, then it seems to us that everything that Branin did here -- such as preparing an individualized sales pitch or presenting a new fee schedule -- would have to be appropriate if done by a voluntary seller setting up his own solo business.  It is not clear to us that the result should be different here solely because Stein Roe existed prior to Branin's move and because there are other employees who could have participated in the sales presentations and preparations.

The district court found the question of "initiation" irrelevant to its analysis.  See id. at 396 n.10 (finding that "Von Bremen and Mohawk Maintenance Co. place no significance on who initiates the communications between the seller of good will and his now-former clients").  In the court's view, Von Bremen's broader concern was that "it would be bad faith" for the seller "to avail himself as against the [buyer] of any special knowledge or advantage derived by him from the business whose good will he has voluntarily sold."  Id. at 396 (quoting Von Bremer, 200 N.Y. at 52, 93 N.E. at 190) (quotation marks and emphasis omitted).

We read the New York case law differently.  Inasmuch as Von Bremen relied on bad faith, the reliance on bad faith was not relevant to the solicitation analysis, but was instead part of a separate discussion of the basis for the distinction between voluntary and involuntary sales of good will and for applying the implied covenant in the former case to the exclusion of the latter.  See Von Bremen, 200 N.Y. at 51-52, 93 N.E. at 190.  And, contrary to the district court's suggestion that "initiation" is of no special significance, the identity of the initiator has been treated as both relevant and important for courts that have applied the implied covenant.  They have characterized the forbidden action with words signifying direct initiation of communication, such as "solicit," Von Bremen, 200 N.Y. at 48, 93 N.E. at 188; Mohawk, 52 N.Y.2d at 286, 419 N.E.2d at 329, 437 N.Y.S.2d at 651, "approach[]," Mohawk, 52 N.Y.2d at 284, 419 N.E.2d at 328, 437 N.Y.S.2d at 650; Slomin's, Inc. v. Gray, 176

25

A.D.2d 934, 936, 575 N.Y.S.2d 545, 547 (2d Dep't 1991); Kraft Agency, Inc. v. Delmonico, 110 A.D.2d 177, 181, 494 N.Y.S.2d 77, 80 (4th Dep't 1985), "apply," Von Bremen, 200 N.Y. at 48, 93 N.E. at 188, "specifically and directly appeal[]," id., 200 N.Y. at 50, 93 N.E. at 188, and "drum up or circularize," In re Brown, 242 N.Y. 1, 10 (1926) (Cardozo, J.). In Von Bremen itself, the Court of Appeals recognized that a previous attempt to divorce solicitation from initiation that had been made by Lord Jessel in Leggott v. Barrett, (1880) 15 Ch.D. 306 had been rejected by the higher court. Von Bremen, 200 N.Y. at 48, 93 N.E. at 188. The language of Mohawk is perhaps the most suggestive of the importance of initiation in the application of the implied covenant, since the court described the implied covenant as "restrict[ing] the economic freedom of the seller only insofar as it precludes him from approaching his former customers and attempting to regain their patronage after he has purported to transfer their 'good will' to his purchaser." Mohawk, 52 N.Y.2d at 284, 419 N.E.2d at 328, 437 N.Y.S.2d at 650 (emphasis added). And in the case before us, it is entirely clear that the Palmer family, not Branin, initiated the contacts that led to the transfer of its account to Stein Roe.

We might make the assessments as to whether Branin's efforts in following up on the Palmer family's initiation of contacts constituted improper solicitation. Or, insofar as factual questions as to "initiation" and "causation" are involved, we might return the case to the district court, asking

26

it for a more specific examination of those issues. But we find it difficult for either us or a district court to make that determination in the absence of further explication as to the law of the State of New York as to "improper solicitation" under these circumstances. Especially in light of the importance of New York, and New York law, in the financial services industry, we think, and the New York Court of Appeals may agree, that it is that court which should make this determination in the first instance.

Generalizing, we seek instruction as to whether two sets of actions, taken together, amount to "improper solicitation" under the law of the Mohawk doctrine: (1) the active development and participation by the seller, in response to inquiries from a former client whose good will the seller has voluntarily sold to a third party, of a plan whereby others at the seller's new company solicit a client, and (2) participation by the seller in solicitation meetings where the seller's role is largely passive.

III. Damages

Following a two-day trial on damages, the district court rejected Bessemer's "lost profits" theory of damages and accepted Branin's "return of capital" theory, concluding that Branin was liable to Bessemer on the breach of contract claim in the amount of $1,229,173: $826,335 damages and $402,838 prejudgment interest. Bessemer III, 544 F. Supp. 2d at 393. Both parties challenge this finding. Branin argues that there

27

should be no damage award because Bessemer did not prove a causal link between the breach and Bessemer's injury. Bessemer argues that the district court erred in accepting Branin's "return of capital" theory rather than its own "lost profits" theory.

Since we are certifying the threshold question of whether Branin is liable to Bessemer for improper solicitation, we need not reach th question of how Bessemer's damages should be calculated, and thus reserve judgment on that issue. However, we do consider Branin's argument that, even if he breached the contract, the breach was harmless, because such a finding would obviate the need to determine liability. Branin bases this argument upon the district court's observation that it was "really hav[ing] difficulty believing that [Palmer] was going to stay with [Bessemer] given what he thought of [its] people. . . . Even assuming that he was not going to go over to Branin, he was not going to stay with Bessemer." Trial Tr. at 1060, quoted in Appellant's Br. at 17 n.5. We find this argument unpersuasive because it overlooks the fact that the district court made at least two explicit findings on the issue. See Bessemer III, 544 F. Supp. 2d at 389 n.8 (finding "that defendant's conduct played a role, but not the sole role in Palmer leaving Bessemer"); Bessemer I, 427 F. Supp. 2d at 396 (finding that Bessemer "has carried th[e] burden" to "prove that Branin's improper actions caused Palmer to move his account from Bessemer to Stein Roe"). As Branin has demonstrated no clear error in these findings of fact, we reject his argument that Bessemer has failed to prove

28

that, provided Branin is liable, damages would be greater than "zero."

We reserve decision on the correct method for the calculation of damages until we receive further guidance from the New York Court of Appeals on liability, and, if it wishes, on damages, should the court choose to accept the question that we certify.

IV.  Branin's Counterclaims

Branin asserted four counterclaims in the district court: breach of contract with respect to his position at Bessemer, breach of contract as to his bonus, quantum meruit, and promissory estoppel based on the sale of the business and his offer of employment by Bessemer.  On appeal, Branin alleges error only with respect to the district court's grant of summary judgment on his breach of contract claims.  The quantum meruit and promissory estoppel arguments are therefore waived.  See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).  And we find no error in the district court's rejection of Branin's remaining breach of contract claims.

A.  Breach of Bonus Plan

Exhibit D to the Purchase Agreement sets out the criteria by which Branin's cash bonus was to be determined.  Specifically, that exhibit provides that while Branin is "eligible for participation in the Incentive Cash Bonus Plan[, t]he amount of the bonus is at the discretion of the Salary

29

Committee, and at this time has a range of 0% to 250% of base pay."  Purchase Agreement, Ex. D, at 1.

Branin alleges that at the end of 2001, the other former Brundage principals received bonuses amounting to between ninety-two and more than one-hundred percent of the maximum bonuses provided for in Exhibit D to the Purchase Agreement.  He asserts that he received instead only twenty percent of his potential bonus (slightly more than fifty percent of his base salary).  He alleges that this constitutes a breach of Exhibit D. The district court rejected this claim on the ground that the same agreement expressly "allows for a discretionary bonus range between 0% and 250% of his salary," Bessemer II, 498 F. Supp. 2d at 638, and Branin's bonus, at more than fifty percent of his salary, "was within this range," id.

Branin concedes that under New York law "the insertion of the word discretion into a bonus arrangement signals the end to any possible challenge to a bonus determination," Appellant's Br. at 60, but argues that the allowance for discretion does not settle the matter here.  He asserts that the Purchase Agreement included a "detailed written bonus plan incorporating explicit objective criteria and procedures."  Id.  Branin provides no persuasive authority to support his theory.

In Valentine v. Carlisle Leasing Int'l Co., No. 97 Civ. 1406, 1998 WL 690877, 1998 U.S. Dist. LEXIS 15581 (N.D.N.Y. Sept. 30, 1998), on which Branin relies as support for his argument, the court reached precisely the opposite result from that which

30

Branin seeks here.  The court considered an offer letter that "clearly stated" that the employer "would retain absolute discretion to determine both whether [the plaintiff] would receive a bonus and, if so, how much he would receive."  Id., 1998 WL 690877, at *4, 1998 U.S. Dist. LEXIS 15581, at *11.  In light of this explicitly conferred discretion, the court held that the plaintiff had no right to have the bonus terms enforced.  Id.

To be sure, in reaching this conclusion, the Valentine court noted in dicta that the employee's letter conferring employment "indicated only generally that [the employee's] entitlement to a bonus would depend on his performance and that of the company but did not set forth objective criteria on which [the employer] would base its decision."  Id.  Branin attempts to seize on this language in Valentine to argue that where, as here, objective criteria are present, the failure to provide a bonus that meets those criteria is actionable despite the fact that discretion to provide a bonus was explicitly reserved by the employer.  But, Valentine does not stand for the proposition offered.  The dicta relied on by Branin did nothing more than explain the many ways in which the employer reserved discretion for itself.

Exhibit D to the Purchase Agreement that Branin seeks to enforce here expressly states that its terms "do not and are not intended to create either an expressed or implied employment contract."  Purchase Agreement, Ex. D at 2.  Exhibit D expressly

31

states that any bonus to be awarded is "at the discretion of the Salary Committee." Id. We find no error in the district court's reading of these clauses as dispositive of Branin's claim: They reserve to the Salary Committee the decision to award or not to award a bonus, and in what amount.

B.    Breach of Purchase Agreement

The Purchase Agreement required that Branin be given a position at Bessemer "generally comparable" to his former position at Brundage. Purchase Agreement, § 7.01(vii). The parties agreed upon what that position would be, the title of Managing Director, the base salary and bonus range, the terms of vacation time, and the form and scope of other benefits. Branin does not dispute that he received all that was agreed upon in this respect. Branin nonetheless continued to argue to the district court, and continues to argue here, that he suffered "diminished responsibilities, exclusion from meetings, and effective demotion throughout his time at Bessemer." Bessemer II, 498 F. Supp. 2d at 635. Because of these alleged diminished responsibilities, Branin maintains that "questions of fact exist as to whether there was a material diminution in Mr. Branin's duties and responsibilities subsequent to the closing." Appellant's Br. at 63.

The district court rejected this argument, concluding that even had Branin suffered the demotion and other grievances he alleges, Bessemer would not have breached any term of the

Purchase Agreement or offer letter by doing so.  Bessemer II, 498 F. Supp. 2d at 635-36.  We agree.

Branin characterizes the Purchase Agreement's requirement that he be provided with a role that was "generally comparable" to the role he had at Brundage as "a commitment that so long as Mr. Branin remained in Bessemer's employ, he would function in a comparable position with commensurate authority." Appellant's Br. at 64.  But that is not what the contract says. Rather, the contract provides as a condition precedent to closing that the Brundage principals, Branin among them, accept in writing the terms of employment offered by Bessemer for a generally comparable position prior to the closing date.  There is no allegation that this condition was not fulfilled.  And Branin seems to concede as much in his admission that his "employment at Bessemer was not subject to a definite duration." Id.  Branin was thus essentially an at-will employee whose duties were subject to change or termination based on the needs and desires of his employer.  Cf., e.g., Finley v. Giacobbe, 79 F.3d 1285, 1294-95 (2d Cir. 1996) (noting that, with limited exceptions not relevant here, under New York law, "an employee serving purely at will, by definition, has no contractual right to avoid dismissal").  If he could be dismissed at will by Bessemer, it seems to us, the lesser action of changing his role at the firm, subject of course to his choosing to depart at his option instead, was permissible too.

V. Certification to the New York Court of Appeals

33

Under the rules of this Circuit, "[i]f state law permits, the court may certify a question of state law to that state's highest court."  2d Cir. R. 27.2(a); see also Prats v. Port Auth. of N.Y. & N.J., 315 F.3d 146, 150-51 (2d Cir. 2002). Certification is within the discretion of this Court.  See McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir. 1997).

In the past, we have recognized several factors that guide our decision of whether to certify a question to the New York Court of Appeals.  First, and most important, we have recognized that certification may be appropriate if the New York Court of Appeals has not squarely addressed an issue and other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it.  See Kuhne v. Cohen & Slamowitz, LLP, 579 F.3d 189, 198 (2d Cir. 2009); O'Mara v. Town of Wappinger, 485 F.3d 693, 698 (2d Cir. 2007).  We find insufficient guidance in past New York cases regarding the application of the Mohawk doctrine to determine how it would be applied to the facts of this case.  And, as we have noted, we think that because of the prominence of the financial services industry in the State of New York, clarification of New York law on the issues presented in this case would be of significant public interest.

Second, certification may be appropriate where resolution of an issue involves value judgments and public policy choices that the New York Court of Appeals is best situated to make.  See Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d

34

214, 229 (2d Cir. 2006); <u>Blue Cross & Blue Shield of N.J., Inc. v. Phillip Morris USA, Inc.</u>, 344 F.3d 211, 221 (2d Cir. 2003). We think that the New York Court of Appeals is better positioned to determined the scope of permissible solicitation under New York law of former clients by voluntary sellers of those clients' good will.

Finally, we have found certification appropriate where the question certified will determine the outcome of the case. <u>See</u> <u>O'Mara</u>, 485 F.3d at 698 (analyzing earlier version of the Second Circuit local rule governing certification). Here, resolution of the question of the scope of the <u>Mohawk</u> doctrine will determine our resolution of the question of liability and therefore control the outcome of this appeal of the district court's decision.

Because each of these factors suggests that certification is appropriate, we hereby certify the question restated below.

**CONCLUSION**

For the foregoing reasons, we certify the following question to the New York Court of Appeals: **W**hat degree of participation in a new employer's solicitation of a former employer's client by a voluntary seller of that client's good will constitutes improper solicitation? We are particularly interested in how the following two sets of circumstances influence this analysis: (1) the active development and participation by the seller, in response to inquiries from a

35

former client whose good will the seller has voluntarily sold to a third party, in a plan whereby others at the seller's new company solicit the client, and (2) participation by the seller in solicitation meetings where the seller's role is largely passive.  We do not intend to in any way limit the scope of the New York Court of Appeals' analysis based on the facts of the case through the formulation of this question, and we invite the Court of Appeals to expand upon or alter the question as it may deem appropriate.  See Kirschner v. KPMG LLP, 590 F.3d 186, 195 (2d Cir. 2009).

Pursuant to New York Court of Appeals Rule 500.17 and United States Court of Appeals for the Second Circuit Rule 27.2, it is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York this opinion as our certificate, together with a complete set of the briefs, appendix, and record filed in this Court by the parties. We direct the parties to bear equally any fees and costs that may be imposed by the New York Court of Appeals in connection with this certification.  This panel will retain jurisdiction of the appeal after disposition of this certification by the New York Court of Appeals, and after the Court of Appeals' judgment should it choose to accept this certification.